## THE STATE v. GARTRELL, Appellant.

### Division Two, February 3, 1903.

1. **Amendment of Record:** IN FIERI DURING TERM: ADJOURNMENT.
   During the whole of the term in which any judicial act is done,
   the proceedings are considered "in course of accomplishment," and
   this applies to adjourned sessions of the same term, and during that
   term the record remains in the breast of the judge, and subject
   to alteration or amendment as he may direct, nor is this power of
   amendment during the term affected by the fact that an appeal has
   been taken from its judgment.   But after the lapse of that term
   the judge has no power to change the record further than by a nunc
   pro tunc entry to make the record, speak the exact truth of that
   which did actually occur during the term, and then only when there
   is sufficient record or minutes of the judge or clerk to authorize
   such amendment.

2. ———: CONTINUANCE: APPEALS.   A motion for a continuance is no
   part of the record proper.   And the fact that the clerk of the trial
   court copies such motion in his transcript of the record proper does
   not make it a part thereof.   And a bill of exceptions, after the time
   for filing the same has passed, can not be so amended as to make
   such a motion a   part thereof if there is nothing in the record
   or the judge's or clerk's minutes to justify a   nunc pro tunc
   entry.

3. ———: BY STIPULATION.   Neither the trial court nor the appellate
   court, even though the Attorney-General by written stipulation so

agrees, can permit an appellant to so amend his bill of exceptions by inserting therein a motion for a continuance and his exception to the overruling thereof, made at the term at which he was tried, if the time for filing the bill of exceptions had passed before the attempt at amendment was made.

4. **Jurors:** COMPETENCY: NEWSPAPER REPORTS. A juror who, on his *voir dire* examination, answers that he has formed an opinion˙ of defendant's guilt from reading newspaper statements, but has not talked with any witness, and that˙ notwithstanding his opinion based on newspaper reports, he can render a fair and impartial verdict on the evidence, and that he has no prejudice, is not disqualified.

5. ———: ———: TALK ABOUT BURIAL OF DECEASED. A juror who talked with a person who attended the burial of deceased, but who on his *voir dire* examination states that such person did not detail any fact tending to show defendant guilty of the crime charged, and who further expressly states that this casual talk in no manner formed the basis of˙ his impression as to defendant's guilt, which he said was based solely on newspaper reports, is not incompetent.

6. **Evidence:** CIRCUMSTANCE: FINDING OF AXE. Deceased had been killed by a sharp instrument, such as an axe or hatchet. The evidence traced a wagon to the creek in which his body was found. Defendant left the wagon with a farmer a few miles further on, and no axe was found therein, and next morning after the homicide no axe was found in the cabin, in which defendant and deceased had spent two or three days. The defendant in his confession had stated that he had killed deceased with an axe and thrown his dead body into the creek. *Held,* in a case where the defense was insanity and self-defense, that the finding of an axe three hundred yards from where the body of deceased was found, along the creek where defendant had driven the wagon, was a circumstance and a fact for the jury to consider in determining whether or not this axe was the instrument with which the mortal wound was inflicted.

7. **Co-Defendant:** PRODUCTION: TESTIFYING AGAINST DEFENDANT. Witnesses testified to seeing defendant and a young man with deceased in the vicinity on the day before the homicide, and to seeing them the next day after the homicide in deceased's wagon on the road from the point where the body of deceased was found in a creek. *Held,* that it was not error to compel the defendant's son, who had been jointly indicted, to be brought into court in order that these witnesses might identify him as the young man who had accompanied defendant at the times mentioned. The identification of the son who had been jointly indicted with defendant was not forcing the son to testify against the defendant. Such matters are to be disposed of on the same principle that permits the court to compel a defendant to stand up or sit where a witness can see him in order that he may identify him.

8. **Evidence:** PAPERS BEARING DECEASED'S NAME. A pocketbook, receipts for money paid for stocks, and certificates of stock, bearing the name of deceased, found in a wagon which defendant had turned over to a farmer to be kept by him for a short time, are competent evidence against defendant in a trial for murder.

9. **Abuse of Prisoner:** NO EXCEPTION. Where no exception to characterizations of a prisoner on trial, by the prosecuting attorney in his opening statement, was saved at the time they were made, the point that the court permitted the State thereby to abuse the prisoner, is not open for review.

10. ————: "BUM": "SHABBY": "FREQUENTER OF IMMORAL PLACES." The prosecuting attorney in referring to the fact that, soon after defendant's return to a city from a trip with deceased, who was shown to carry considerable money, defendant lavishly spent money, said that prior thereto defendant was "a bum in and about the city, he had no money, was without means, without support, he wore very inferior clothing, looked shabby, and had been a frequenter of places of questionable morality." All these facts were established by the evidence. *Held*, that the prosecuting attorney did not abuse his position in thus describing defendant.

11. ————: OBJECTION SUSTAINED: NO EXCEPTION. The prosecuting attorney stated that it would be shown that defendant when in the city "frequented different places that were of questionable morality," and to this defendant objected, and the court promptly sustained the objection, but no exception was taken on the ground that the rebuke was not sufficiently severe, and, therefore, *held*, that the remark is not before the appellate court for review.

12. ————: APPLAUSE OF ATTORNEY'S SPEECH. The record shows that at the close of the speech of the attorney who made the final argument for the State, the crowd in the courthouse began to applaud with their feet, and that at the first sound the court immediately ordered the sheriff to arrest every person guilty of such conduct, and upon the sheriff's reporting that he was unable to tell what persons were stamping, the court rebuked such conduct, and commented upon the impropriety of such acts in a courtroom. No disorder or misconduct had occurred throughout the trial up to this time. *Held*, that the verdict can not be set aside for this momentary applause.

13. **Homicide:** PROVOCATION: WORDS. Mere words, however opprobrious and insulting, are not such a reasonable or lawful provocation as will reduce the homicide to manslaughter. And the court should not by an instruction authorize the jury to determine for themselves whether such words will reduce the homicide to manslaughter.

14. **Repeating Proper Instruction.** Where the court has already

given a proper instruction on circumstantial evidence it is not necessary to repeat it by giving another on the same subject.

15. **Good Character:** NO EVIDENCE: INSTRUCTIONS. Where there is no evidence that defendant was of good character, it is not error to fail to give an instruction on the subject.

16. **Instruction:** NO EVIDENCE: INVASION OF JUDICIARY. A statute could not require a court to instruct upon a state of facts which the evidence does not warrant, for such a statute would be an invasion on the province of the judiciary.

17. ————: ADVANCING TO ASSAULT: MANSLAUGHTER. The court did not err in refusing to instruct on manslaughter in the fourth degree, because the defendant testified that deceased, after the use of opprobrious and insulting words, was advancing on him with a wrench, when he struck him with the pole of an axe and killed him. There was no manslaughter in the case. *Held,* further, that State v. Grugin, 147 Mo. 39, is no authority for a contrary holding.

18. ————: ————: ————: EVIDENCE. Defendant testified that deceased, after the use of opprobrious and insulting words, was advancing on him with a wrench, when he struck him with the pole or helve of an axe, with which he had armed himself. All the credible evidence shows that the head of deceased was split open with the sharp edge of an axe or hatchet, and the wound was not such an one as could have been inflicted with the handle or pole of an axe. *Held, first,* that neither courts nor juries are bound to accept testimony which is contrary to well-known physical laws or the common experience of mankind and the character of the wound justified the jury in finding that the man had been slain with the sharp edge of the axe and to reject as utterly incredible defendant's story; *second,* the instructions should have been for murder in the first or second degree, or justifiable homicide, and there was no room in the case for an instruction on manslaughter.

Appeal from Bates Circuit Court.—*Hon. W. W. Graves,* Judge.

AFFIRMED.

*S. W. Dooley, J. F. Smith, T. W. Silvers* and *Rhodes Clay* for appellant.

(1) The case should have been continued on the application of defendant. One of the defenses was defendant's insanity. To prove this he had made an

effort to obtain the testimony of Judge Dudley, Doctor Black, his former wife, Mrs. E. G. Seligson, his daughter, and Dr. Rhodes.   These witnesses lived in different parts of the country and had known defendant under different circumstances.   Judge Dudley had known the defendant in California, during the year 1889.   Defendant's daughter had been with him in recent years, 1895-6-7, in Texas.   Doctor Black had treated him in Kansas City during the year 1889.   Dr. Rhodes had been his family physician.   His former wife was residing in Virginia.   These witnesses had had opportunities to observe, at different times, and at different places, the habits and actions of defendant, and each fact would have been a link in the chain of circumstances tending to prove his insanity.   The motion for a continuance discloses diligence on the part of defendant and his attorneys in trying to procure the testimony. They had written to where Judge Dudley lived and found that he was in the consular service of the United States, and they had not had sufficient time to procure his address and take his testimony.   They had gone to the former residence of Dr. Black and found that he had moved away.   They had not been able to learn his address.   They had given notice to take the deposition of Miss Gartrell in Texas but were unable to take same on account of her sickness as certified by her attending physician.   They had given notice to take the deposition of defendant's former wife, in Virginia, but she, being of an erratic disposition, had refused to testify. This is certified to by the notary.   They had a subpoena issued for Doctor Rhodes, of Mexico, Mo., but he was too sick to attend trial.   This is sufficient diligence. State v. Whitton, 68 Mo. 95; State v. Hickman, 75 Mo. 460; State v. Anderson, 96 Mo. 250; State v. Klinger, 43 Mo. 127.   (2) Assignments two, three, four and five may be considered together.   In these assignments, defendant asserts that he did not have a fair trial, on account of passion and prejudice, and that reversible error was committed on account of the unrebuked remarks of the prosecuting attorney and the assistant

prosecuting attorney. These remarks were abusive in the extreme, and tended to reflect on defendant's character. The readiness with which the audience applauded the vituperative remarks of the counsel for the State in regard to defendant, disclosed that the courtroom was filled with people clamoring for defendant's conviction. There was an entire absence of that calm, deliberate consideration which should characterize the conduct of a trial. By reference to the record, it appears that the sheriff was unable to control the audience. Under such condition conviction was inevitable. Prosecuting Attorney Horn, in his opening address, characterized the defendant as a "bum." He referred to his clothing as "shabby." He spoke of his condition as being "without means, without support." He referred to defendant's habits as those of a frequent visitor of places "questionable for morality." In his closing address, Assistant Attorney Clark, called the defendant a "murderer," an "assassin," a "snake." All these remarks were excepted to. There was no rebuke of counsel by the court. This court has reversed cases for less reprehensible conduct. In State v. Ulrich, 110 Mo. 350, defendant was called a "sugar-loaf, squirrel-headed Dutchman." Held reversible error. In State v. Fisher, 124 Mo. 460, defendant was referred to as a "contemptible brute, unworthy of the respect of the community." This was held reversible error. In State v. Young, 99 Mo. 666, defendant was characterized as a "low-down, dirty devil." This was held reversible error. In State v. Bobbst, 131 Mo. 328, this language was used, referring to defendant: "This infamous, lecherous scoundrel." Defendant was charged with concubinage. Reversed. In State v. Prendible, 165 Mo. 359, the defendant was referred to as a "loafer." Held error. The prosecuting attorney in this case stated matters not in the record and which could not be testified to under any circumstances. (3) The court erred in permitting W. P. Gartrell to be introduced in evidence. He was jointly indicted with defendant, for the same offense. His case had not been

disposed of.   He was brought into court, seated by the defendant, and identified by witness Patterson as the party seen in company with defendant.   Our statute expressly prohibits a co-indictee, while his case is pending and undisposed of, to testify.   If the State could not force W. P. Gartrell to testify verbally, could he be put on exhibition as a link in the chain of testimony against defendant?   R. S. 1889, sec. 2636; State v. Chyo Chiagk, 96 Mo. 395.   (4)   Defendant was clearly entitled to an instruction on manslaughter in the fourth degree, and it was error for the court to fail to give such an instruction and to refuse instructions 22 and 23, asked by defendant on this point.   State v. Mathews, 148 Mo. 185; State v. Garrison, 147 Mo. 548; State v. Grugan, 147 Mo. 39; State v. May, 142 Mo. 135.   And the fact that defendant claimed the killing was done in self-defense does not deprive him of the right to an instruction on manslaughter.   State v. Mathews, 148 Mo. 184.   (5)   The court should have given an instruction on good character, after a futile attempt by the State to impeach defendant, and the remarks of the prosecuting attorney reflecting on defendant's character.   R. S. 1899, sec. 2627; Laws 1901, p. 149.   (6)   The court should have instructed the jury "that the law of self-defense is applicable alike to the insane as well as to the sane, that both defenses (insanity and self-defense) are consistent, and if the jury find one or both such defenses in favor of the defendant, they should return their verdict of not guilty."

*Edward C. Crow,* Attorney-General, and *C. D. Corum* for the State.

(1)   (a)   Complaint is made that the prosecuting attorney in his opening statement to the jury, denounced the defendant as a "bum," dressed in "shabby" clothes. But such remarks were not objected to, nor was any exception made to their utterance.   Defendant also complains that he was prejudiced by the prosecuting attorney's stating that while in Kansas City the defend-

ant frequented places of questionable morality. He did object to these remarks and the objection was sustained. And no exception was taken to the failure of the court to rebuke counsel. (b) As to the statements made by Mr. Clark, who was assisting in the prosecution, it is only necessary to call the court's attention to the fact that the remarks were not properly objected to nor was the court called on to rule whether counsel had overstepped the bounds of legitimate argument. Besides, in calling the defendant a murderer and an assassin, counsel only pronounced him what his whole argument was intended to demonstrate him to be. Only on the clearest showing should a judgment be reversed for this cause. The words were not used in a vituperative sense. State v. Griffin, 87 Mo. 608; State v. Ewing, 79 Mo. 463; State v. Musick, 101 Mo. 273. (c) Defendant's guilt was clearly and conclusively shown. In such cases a judgment will not be reversed because of improper remarks of counsel in addressing the jury. State v. Phillips, 160 Mo. 507. (2) No specific objection was made to the competency of Simpson. The specific cause for the challenge should have been given. State v. Evans, 161 Mo. 107; State v. Taylor, 134 Mo. 109. While it is true that juror Bothwell had talked with a witness, it appears that said witness only told him something of the burial of the deceased and that said witness did not undertake to set out any of the facts pertaining to the crime, and that his opinion was not even partially based on what the witness said, but wholly on newspaper reports. He was a competent juror. State v. Hunt, 141 Mo. 630; State v. Duffy, 124 Mo. 1; State v. Williamson, 106 Mo. 162; State v. Bronstine, 147 Mo. 530. (3) No error occurred in permitting defendant's son, who was jointly indicted, to sit where the witnesses might identify him. Had the defendant denied the commission of the crime, or that he was accompanied by the son, the matter might have presented a different phase. But he admitted both. Besides, several witnesses had already testified that they had seen the son at the jail, and that he was

the party that they had seen in company with defendant. The court had the right to order that he be brought before the jury that the witnesses might look at him and testify. Attorney-General v. Fadden, 1 Price 403; Rice v. Rice, 1 Atl. 736. (4) The evidence did not warrant an instruction for manslaughter in the fourth degree. The testimony of defendant did not show that he struck deceased with the ax while in a violent passion. On the other hand, he testified that deceased started towards him with a wrench. His testimony, if believed by the jury, made out a case of self-defense and the jury were so instructed. State v. Sumpter, 153 Mo. 436; State v. Smith, 114 Mo. 406; State v. Sneed, 91 Mo. 522; State v. Meadows, 156 Mo. 116; State v. Ellis, 74 Mo. 207; State v. Lewis, 118 Mo. 82. (5) The instruction on the defense of insanity is a copy of those that have frequently been sanctioned by the court. And the jury were clearly and intelligently advised that they must acquit the defendant if they believed he acted in self-defense, or if he killed deceased at a time when he was incapable of understanding that the act was in violation of the laws of God and society. This was sufficient. State v. Pagels, 92 Mo. 314; State v. Holloway, 156 Mo. 222; State v. Duestrow, 137 Mo. 44. (6) The defendant offered no evidence of his previous good character. How, then, can he complain because the court failed to instruct that his good character was a proper matter for the consideration of the jury? There was no evidence on which to base such an instruction, and the court would not have been warranted in giving it. R. S. 1899, sec. 2627; State v. McNamara, 106 Mo. 106; State v. Westlake, 159 Mo. 678.

GANTT, P. J.—From a conviction of murder in the first degree the defendant appeals.

On or about the middle of March, 1901, D. B. Donegan, who had been living in Victor, Colorado, engaged in mining and investing in mining stocks in a limited way, appeared in Kansas City, Missouri. About that

time he purchased a wagon and team at the sale stables of J. J. Kirby, 526 Grand avenue, in said city, paying cash for the same.

On March 18, 1901, three men, strangers in that community, were observed in the neighborhood of Amoret, a town on the western border of Bates county, traveling in a new two-horse farm wagon. The evidence in this case identified the three strangers beyond all doubt, as D. B. Donegan, the deceased, James W. Gartrell, the defendant, and his son, William Gartrell. While in that neighborhood they occupied a deserted log cabin for two nights.

Newton McMullin, who lives near Amoret, saw the defendant and the deceased together while they were stopping at the cabin. He sold the deceased corn and eggs and was at the cabin after they left, and saw blood on the floor east of the door. He also found a pair of gloves that he had seen deceased wearing the day before they left. Wagon tracks were visible close to the cabin, and leading out west to the road, and thence north for three-quarters of a mile, and thence east. The creek was not fordable at that time, and there was no bridge in the immediate vicinity of the cabin by which they could have gone south. The wagon did not follow the main road, but turned into a gate and followed an unfrequented way east.

John McMullin testified to seeing defendant and deceased at the shanty for two days. They left there about the 19th or 20th of March, 1901. He saw the blood in the cabin two days after they left.

In April, after these parties were seen at Amoret, and at the old shanty, two boys, the sons of F. B. Nichols, who lived about a quarter of a mile from Mulberry creek, a stream about two and one-half or three miles southeast of Amoret, found the dead body of D. B. Donegan in Mulberry creek. They were fishing and caught it with their hooks. Discovering that it was the body of a dead man, one of them went for their father. Mr. Nichols came and saw the body in the creek. The coroner, Dr. Renick, was notified, and an

inquest held. When the body was taken from the creek, it was clothed with a heavy knit shirt, a pair of drawers, corduroy pantaloons and a black overshirt. No coat, vest, or shoes were on the body. Some white cloths were tied over and around his head, and over these a large sack or bag, and over all a blanket was wrapped and tied with whip cord.

Dr. O. F. Renick, the coroner, testified that he was present when the body was removed from the creek and that it was clothed and wrapped as above detailed by Mr. Nichols.

An examination by the coroner disclosed a cut in the temporal bone or base of the skull, two or three inches deep, and three and a half or four inches long, and when the skin was removed the wound stood open so that the Doctor could readily put his finger in it. The wound was evidently produced by a sharp instrument, and such as would have naturally been caused by an axe or a hatchet. This wound was a mortal one, and caused the death of Donegan. From the fact that the water was cold and the flesh not exposed, the body was in a fair state of preservation when found.

A photograph of the deceased identified by his brother was shown the coroner and in his opinion it was the photograph of the dead man on which he held the inquest.

On March 20, 1901, the defendant and his son left the old shanty early in the morning and stopped at the house of Mr. Nichols. He was in the field and inquired the way to the River Bridge. He requested Nichols to direct him to Nyhart, the nearest station on the railroad. Said he had business there. He inquired how the trains ran and when the first train would come along.

L. C. Baker lives at Nyhart. On March 20, 1901, the witness met defendant and his son traveling in the wagon about ten o'clock in the forenoon west of Nyhart station. The defendant was driving. He inquired of Baker if he could get some one to keep his team for him, for a few days, and Baker agreed to do so and they agreed upon a dollar a day. He said he wanted to go

on the 11:30 train. Baker told him to hitch the team to the rack, and he would get them when he came back from getting a load of corn. When he returned he found the team there and took them and kept them until the seventh of April, when he delivered them to a man named Gid Edwards of Kansas City, on a written order from defendant under the name of M. C. McCune, which name he gave to Baker, when he said he would send for the team.

W. J. Bard testified that during the last week in March, 1901, he found an axe at the crossing of Mulberry creek about three hundred yards from where the body of Donegan was found, and identified the axe offered in evidence as the one he found.

J. A. Patterson lived at Nyhart, and on the morning of March 20, 1901, defendant and his son came into the store of the witness at Nyhart and inquired when the train would leave, and being told 11:30, asked who he could get to keep his team for a few days; that he was not well and had concluded to go home on the train; that he was on his way home from the Nation.

Braden testified he lived near Mulberry postoffice, and knew the cabin where the homicide was committed. It was about three and one-half miles from the home of Nichols. The road which defendant traveled when he left the cabin is a neighborhood road, through the fields.

Thomas Clifford lived in Kansas City. He testified to selling Donegan the team referred to by the witnesses, for $130. The defendant was present when Donegan paid for the team and harness.

He had quite a roll of bills besides the money he paid for the horses. He noted a $100 bill that he paid Ward for the wagon. Donegan was wearing a corduroy suit when he bought the team. Clifford testified he afterwards identified the dead body of Donegan in a coffin at Amoret or near there. Clifford gave Donegan a bill of sale for the horses and harness.

Later in April, the defendant Gartrell came to Clifford in Kansas City and inquired if he remembered

the team, and when told that he did, said he wanted to sell them.    Clifford told him he would sell it for him, if he had them there, and inquired what had become of Donegan, and defendant said the weather was cold and Donegan took the train and went on down, and the other man had the smallpox.

He told Clifford the team was down in the country near Butler.    Gid Edwards afterwards brought the team and harness to Kansas City, the same he had sold to Donegan.    The team was sold for defendant.

J. J. Kirby also testified that defendant came to him and wanted to know if he wanted to buy that team back.    He said they were down below Butler; that his boy had the smallpox, and he had to send him away. That there was a feed bill of $15.

Kirby sent Gid Edwards after the team with a written order signed M. C. McCune, the name which defendant gave as his at the time.    Kirby sold the team when Edwards returned with it.

When the body of Donegan was found the people in the neighborhood of Amoret at once recalled the presence of the strangers at the old shanty near Amoret, and the significant fact that only two of the three had been seen by Nichols, Baker and others when the team was driven to Nyhart.

The news of the murder rapidly spread and the police force of Kansas City soon had their attention called to the fact that the defendant, who was known to be impecunious, had been spending money quite freely in the saloons.

He was watched, and then the facts of the purchase of the team by Donegan, his departure for Oklahoma, his association with defendant, the return of the defendant and his sending for the team, the identification of the dead man as Donegan, were developed.    Thereupon defendant was arrested and made a confession that he had killed Donegan, robbed his dead body of some $260, and his watch, and had thrown his body in Mulberry creek.    He was taken back to Bates county, indicted by the grand jury in May, 1901, at the February term of

the Bates Circuit Court. The cause was continued until the regular June term. At the June term two members of the bar, Messrs. Dooley and Ludwick were appointed counsel for defendant. An application for a continuance was filed and a continuance granted to the November term, 1901. At the November term additional counsel, Judge J. F. Smith and John L. Stanley, Esqr., were appointed in lieu of Mr. Ludwick, who had in the meantime been appointed prosecuting attorney of the county.

Mr. Rhodes Clay, a member of the Audrain bar, also appeared as counsel for defendant, and another application for a continuance was made, which was denied, and defendant was put on his trial and found guilty of murder in the first degree, and his motions for a new trial and in arrest having been overruled, he was duly sentenced to be hung. From the sentence thus imposed he appeals to this court.

Various errors are assigned for a reversal of the judgment.

From the statement of the case it will be observed that the *corpus delicti* was established beyond a peradventure. The defendant was shown beyond all doubt to have been the slayer of Donegan. His defenses were insanity and self-defense.

I. The first assignment, in order, is that the circuit court erred in refusing the defendant a third continuance, at the November term, 1901. To correctly determine this point, reference must be had to the state of the record.

The motion for continuance and the affidavits and exhibits in support thereof were filed on the 16th of November, and the record shows the application was overruled November 17, 1901.

After the conviction of defendant and the overruling of his motions for a new trial and in arrest of judgment, he was granted until February 11, 1902, to file his bill of exceptions, and a stay of execution pending his appeal. At the February term, 1902, and before the expiration of his leave, the time to file his exceptions

was by order of the court extended to March 24, 1902. Again on March 24, 1902, an extension was granted to April 5, 1902, and afterwards on March 31, 1902, in vacation, his bill of exceptions was presented to the court, examined, approved and signed by the judge and filed by the clerk and thus became a part of the record. The bill of exceptions thus filed completed the record of this case in the circuit court of Bates county, Missouri, but after the bill of exceptions was thus completed and filed, and after, not only the February term, but the June term of said court had intervened and been finally adjourned, and after a perfect transcript of the record including said bill of exceptions had been filed in this court on May 4, 1902, and the cause set down for argument at the October term, 1902, of this court, and without any suggestion that the clerk of the circuit court had omitted or neglected to certify any portion of the record or any exhibit or document on file as a part of said bill of exceptions, and after the Attorney-General had prepared and printed his statement and brief in the cause, the cause was permitted to go over to the January call of this term on account of the untimely death of Hon. Rhodes Clay, one of defendant's counsel, and it appears that a stipulation was entered into between the counsel for defendant and the Attorney-General whereby it was agreed "that the bill of exceptions now on file in the Supreme Court in this cause may be corrected and amended by the Hon. W. W. Graves, Judge of the Bates Circuit Court, signing and sealing as a part of the same the application for a continuance filed by the defendant at the November term, 1901, of said court, with the exhibits, affidavits and papers filed with said application at the time defendant filed his application in court, together with the ruling thereon and all the docket entries in connection therewith and the same shall be certified up by the clerk of Bates Circuit Court, as a part of, and considered with the bill of exceptions now on file." On the twenty-second day of the regular November term for the year 1902 of the Bates court, and on December 29th, 1902, this stipula-

tion was presented to the circuit court of Bates county, his Honor, the Hon. W. W. Graves, presiding, and the leave was granted to amend the bill of exceptions as stipulated, and thereupon a paper was filed containing the motion and affidavits for a continuance, the order of record overruling the same and then a recital that defendant duly excepted to the action of the court in denying said application, and so made up, was signed by Judge Graves, and was certified to this court by the clerk of that court under a separate cover, and lodged in the office of the clerk of this court on January 2, 1903, in the vacation of this court, during the adjournment from December 16, 1902, to January 6, 1903. It has not been filed in this court by leave of the court.

What effect, then, is to be attributed in law to this attempt to cure the failure to incorporate the motion and affidavits for a continuance and an exception to the action of the court in denying the same? It is the settled law of this State that during the whole of the term in which any judicial act is done, the proceedings are considered *in fieri*, and this applies even to adjourned sessions of the same term, and the record remains, so to speak, in the breast of the judge or judges of the court, and hence is subject to amendment or alteration as he or they may direct, but after the lapse of the term, or its final adjournment, the judge has no power to change the record further than by nunc pro tunc entries to make the record speak the exact truth of that which actually did occur during the term, and *then only* when there is sufficient record or minutes of the judge or clerk to authorize such amendment, as it has been repeatedly ruled by the court that such corrections can not be made ''from outside evidence or from facts existing alone in the breast of the judge, after the end of the term at which the final judgment was rendered.'' [Ross v. Railroad, 141 Mo. 390; Saxton v. Smith, 50 Mo. 490; Dunn v. Raley, 58 Mo. 134; Fletcher v. Coombs, 58 Mo. 430; Jones v. Hart, 60 Mo. 356; Crawford v. Railroad, 171 Mo. 68.]

It is true that the power of the court over its own

records for the purpose of amending, correcting and completing the same is not affected by the fact that an appeal has been taken from its judgment.   [Bank v. Allen, 68 Mo. 474; DeKalb Co. v. Hixon, 44 Mo. 341; Gamble v. Daugherty, 71 Mo. 599; Crawford v. Railroad, 171 Mo. 68.]

These are fundamental principles, and again and again it has been decided by this court that when the period (beyond the trial term) granted by the court in which to file a bill of exceptions has expired, neither the court nor the judge in vacation can extend it, and what purports to be a bill of exceptions filed in pursuance of such a void order will not be considered by this court.   [State v. Apperson, 115 Mo. 470; State v. Mosley, 115 Mo. 545; Danforth v. Railroad, 123 Mo. 196; State v. Chain, 128 Mo. 361; Powell v. Sherwood, 162 Mo. 605.]

Appying these principles to the paper before us and the steps taken to incorporate it in the record on this appeal, it will be seen that no attempt was made in the circuit court to correct the record of the bill of exceptions by a motion for a nunc pro tunc entry.   There was no pretense that there was any entry on the judge's docket or clerk's minutes showing that an exception was saved at the time the motion for continuance was overruled, but if there had been there is not the slightest claim, by suggestion of a diminution of the record in this court, that the original bill of exceptions called for the copying into the bill of the motion for continuance, and accompanying exhibits, and that the clerk by misprision or oversight, failed to copy the same, though attached to or filed with the bill of exceptions.   On the contrary it appears to be and is a case in which counsel have failed to include the motion for a continuance in the bill of exceptions, and their exception to the order overruling it.   Now, did the court, even with the consent of the Attorney-General, have the power at the November term, 1902, to permit counsel to amend their bill of exceptions by inserting this motion and exception in it, the term and time in which they were to file their

exceptions having lapsed, and an entire new term having intervened and adjourned before this attempt was made? We are clear that the court had no such power and that the so-called corrected and amended bill of exceptions is no part of the record before us, and the lodging of it in the clerk's office without the leave of this court adds no sanction whatever to it as a record of this case in this court. It is too plain for argument that unless parol evidence could be resorted to there was nothing to show that such an exception was taken, and when the bill of exceptions was filed and the term had lapsed, the record became a finality which neither court nor counsel, even by stipulation and consent, could change. A motion for a continuance is no part of the record proper and the fact that the clerk has copied this motion into the record proper, certified by him, does not make it a portion thereof.

It follows that the action of the court in refusing the continuance is not before us for review.

II. Complaint is made that two of the jurors were not impartial, to-wit, Messrs. Bothwell and Simpson. On his *voir dire*, Mr. Simpson answered that he had formed an opinion from reading newspaper statements; that he had not talked with any of the witnesses and that notwithstanding his opinion based on the newspaper reports he could render a fair and impartial verdict on the evidence. Had no prejudice. It is perfectly obvious that he was not disqualified. As to juror Bothwell, all that the transcript discloses as to his competency or incompetency is the following: He was one of a group who were being examined on their *voir dire* and they had all answered that they were not members of the grand jury who had preferred the indictment, and were not of kin to deceased or defendant; had no acquaintance with defendant. Asked whether they had formed or expressed an opinion concerning the guilt or innocence of defendant, Mr. Hitt, one of the group, answered he had, and that it was on newspaper reports; that he didn't know any of the witnesses, and thereupon Mr. Bothwell said, "I formed a like opinion."

"Q.   Based upon newspaper reports?

"A.   Yes, sir."

On cross-examination it was developed that Mr. Bothwell met a gentleman who lived in the neighborhood in which the homicide occurred, and this man spoke of the burial of Donegan. He did not detail any fact tending to show that defendant was guilty of the crime. He expressly answered that this casual statement as to the burial of the murdered man in no manner formed the basis of his impression as to the guilt of the defendant. We think the juror was competent, and no error was committed in accepting him as one of the panel.

III. Error is also predicated upon the introduction in evidence of an axe which the witness Bard found in Mulberry creek some three hundred yards below the place at which the body of Donegan was found in the same creek. Prior to the introduction of the axe in evidence, it had been proven that deceased had been killed by a sharp instrument in the nature of an axe or hatchet. The evidence had traced the wagon traveling down and near this creek and the finding of the dead body of Donegan with the wound in the head.

The State then introduced the confession of defendant to the effect that he had killed deceased with this axe. The witness Baker who had found the wagon hitched to the post at Nyhart as directed by defendant, had detailed the articles found in the wagon and there was no axe in the list. The witness who had visited the shanty next morning after the homicide found no axe. Under these circumstances it was a circumstance and a fact, the finding of this axe in the immediate vicinity of the place where the dead body was found and in the creek along which defendant had driven next morning after killing Donegan, for the jury to consider whether it was not the instrument with which the mortal wound was inflicted. We think it was competent as a circumstance in the chain of evidence.

But certainly it constitutes no ground for reversal in the light, not only of the confession, but of the evi-

dence of defendant, that he killed deceased with an axe. He did not account for the axe, but the fact that he killed deceased with an axe, is established by his own evidence, and it can not be any error even if the axe thus found was not the one with which the blow was struck.

IV.  It is urged also that error was committed in permitting the son of defendant, who was jointly indicted with defendant, to be brought into court to enable witnesses, who testified to seeing defendant and another and younger man with Donegan in the vicinity of Amoret the day before the homicide, and to seeing defendant and this young man together in the wagon on the road and at Nyhart next day after the homicide, to identify the son as the young man who accompanied defendant at the times mentioned.

Mr. Patterson had testified that on March 20, 1901, about nine or ten o'clock, he had seen the defendant in Nyhart and there was a young man with him whom he had since seen in the jail at Butler.  At this point one of the learned counsel for defendant said:  "Let the record show that Dr. Gartrell's son was with him on that trip in order to shorten examination."  The Court: "It is questionable whether or not the defendant can make any admissions.  I take it, the shortest method would be to have the young man come up here and let some one identify him.  If the defense assures me they are not going to make any contest on that, there is no use in going into so much of it."

Counsel for defendant:  "No, sir, we are not going to make any contest on it."

The Court:  "Let the young man be brought up."

Later on, Mr. Clay, another one of defendant's attorneys, entered an objection to the court's order directing W. P. Gartrell to be brought into court for identification or any other purpose because he is jointly indicted with defendant.  This objection was overruled.

When W. P. Gartrell, the son of defendant, was brought into court, Mr. Patterson identified him as the man who was with the defendant at Nyhart on March 20, 1901.

In the state of this record the question mooted is purely academical. Since the defendant went on the witness stand voluntarily and testified that his son was with him all the way from Kansas City to Amoret; was asleep in the cabin when he slew Donegan; that he went with him in the wagon to Nyhart and that he had the smallpox when he brought him back to Kansas City; what conceivable harm could result to defendant by Patterson identifying the son under these circumstances, is beyond our ken. The order of the court was evidently made in order to require strict proof of every fact and to require defendant to admit nothing.

But responding to the contention of counsel that the State had no right to identify the son as the companion of defendant when he was at Amoret and Nyhart, we think it clearly untenable. The objection is founded upon a proposition that a co-defendant while his case is yet pending can not testify against his co-defendant, but the identification of the son of defendant who had been jointly indicted with defendant was not forcing the son to testify against the father no more than requiring defendant to stand up, or to sit where a witness, who has been called to identify him, can see him.

As said in People v. Gardner, 144 N. Y. 119 (28 L. R. A. 699), this was not compelling him to give evidence against himself in violation of his constitutional exemption from being a witness against himself.

"He was bound to be in court and in the presence of the jury, the recorder and the witnesses who might be there. The recorder, the jurors and the witnesses had the right to see him, and he had the right to see them. It was necessary that he should be identified as the person named in the indictment and charged with the crime. His mere standing up did not identify him with the alleged crime, and did not disclose any act connected with the crime. . . . Suppose he had come into court with his face veiled, could not the recorder compel him to remove the veil that his face might be seen? Could he not compel him to remove his hat; to

stand or sit in the prisoners' dock? . . . The history of the constitutional provision referred to clearly demonstrates that it was not intended to reach a case like this. [Story's Const. Lim., sec. 1788; 1 Steph. Hist. Crim. Law, 440.] The main purpose of the provision was to prohibit the compulsory oral examination of the prisoner before trial, or upon trial, for the purpose of extorting unwilling confessions or declarations implicating them in crime. It could reach further only in exceptional and peculiar cases coming within the spirit and purpose of the inhibition. A murderer may be forcibly taken before his dying victim for identification, and the dying declarations of his victim may be proved upon his trial for his identification.''

In the Gardner case it was proved that defendant and Mrs. Amos were together upon certain occasions having a material bearing upon the case, and a witness was called to identify the defendant as the person who was in Mrs. Amos's company and being asked, ''Would you know him if you saw him?'' answered, ''Yes,'' whereupon the court ordered the defendant to stand up, and his counsel objected because it would compel him to testify against himself, but the court overruled the objection and the Court of Appeals unanimously sustained the ruling. If compelling a prisoner to submit to identification is not an invasion of his constitutional exemption from testifying against himself, *a fortiori* the identification of a person who was with him even though a co-defendant can not be so. The one is no more sacred than the other. See also State v. Ah Chuey, 14 Nev. 79; Garvin v. State, 52 Miss. 207; State v. Prudhomme, 25 La. Ann. 522; People v. Goldenson, 76 Cal. 328; Com. v. Whitman, 121 Mass. 361.

At common law there would seem to be no doubt whatever of the right of identification. In Rex v. Deering et al., 5 Carr. & Payne 165, a person indicted with others for an offense, but against whom the bill was thrown out, but who was in custody at the time of the trial, was placed at the bar to be identified as one who was in their company. The objection was made that

he ought not to be treated as if the indictment was still pending against him, but the court ruled that there was no doubt as to the right to have the party produced in order that he might be identified, and observed that the same course was pursued on the trial of Thistlewood and others at the Old Bailey.

V.  Over the objection of defendant the court admitted in evidence articles of wearing apparel and other property found in the wagon turned over by defendant at Nyhart to Baker, and by him in turn delivered to Gid Edwards on defendant's order, and afterwards turned over to the detective officers and identified. Among these was a pocketbook in which were a number of papers, a receipt from B. Donegan for $25 part payment for a log cabin in Strong Camp; a receipt from George Williams, dated at Victor, January 16, 1896, for fifty dollars ''on account of Mining Stock Co.,'' a certificate of stock of the Carson-Seattle G. M. Co. certifying D. B. Donegan had paid in full for 50,000 shares in said company, dated February 22, 1896; and a receipt of Donegan for payment ''in full of 100,000 shares of the capital stock of the New Jersey Mining Co.,'' and some verses by M. B. Donegan, entitled ''The Little Grave.''

These things were all competent, found as they were on the body of the deceased, and identifying him as D. B. Donegan.

VI.  We come now to the assignment that the counsel for the State were permitted to abuse the prisoner. Specifying these, counsel complain that the prosecuting attorney in his opening statement characterized the defendant as a ''bum,'' as being ''shabby,'' and ''without means, without support,'' a frequenter of places ''questionable for morality.''

The record discloses that Mr. Horn, the prosecuting attorney, in his opening statement said:  ''It will be shown *before that* time  [referring evidently to the possession by defendant of considerable money after his return to Kansas City from his trip with Donegan], that he had no money, that he was a bum in and about Kansas City, without means, without support;

that he had very inferior clothing on, they looked shabby.'' To this statement no objection whatever was made and no exception saved, but if there had been it would have been groundless. Every statement thus made was subsequently substantially established by the evidence of defendant himself—unless we except the expression ''a bum,'' which is but a contraction in common use for ''bummer,'' signifying a worthless fellow without any visible means of support, and such the evidence strongly tended to establish.

It can not be said that counsel is abusing his position when he thus describes the character of a defendant, when he introduces in connection with his offer to show that such a character was soon afterwards seen handling a large sum of money as a suspicious circumstance.

Under the facts, there is no weight in the point, even if exception had been duly saved to the remarks, but as no objection was made it is of course not before us for review.

Again the prosecuting attorney said, ''It will be shown, gentlemen of the jury, that while in Kansas City he frequented different places that were questionable for morality,'' to which objection was made and the objection promptly sustained. No exception was taken on the ground that the rebuke was not sufficiently severe and this remark, therefore, is not before us for review.

Again error is predicated on the remarks of Mr. H. C. Clark, in the closing argument for the State, in which he said, ''This man beyond all question or shadow of a doubt is a deliberate, willful and premeditated murderer.'' The bill of exceptions shows that Mr. Clay, of counsel for defendant, when this statement was made, said to the court, ''We except to those remarks.'' Again the record shows that Mr. Clark in describing and referring to the presence of Donegan, the deceased, and the defendant in the old cabin the night of the homicide, said, ''An assassin is there, a snake is in his [Donegan's] presence.'' Again Mr. Clay excepted.

It was said by this court in State v. Griffin, 87 Mo.

loc. cit. 615: "In calling the defendant a murderer
he only pronounced him what his whole argument must
have been devoted to in an attempt to demonstrate him
to be, and while I think it would be in better taste to
abstain from the use of such epithets, we can not reverse
the judgment because the attorney called the accused
what the evidence for the State tended to prove him.'"
And Judge SHERWOOD in State v. Emory, 79 Mo. 463,.
well said that "prosecuting attorneys are now so 'cab-
in'd, cribb'd, confin'd,' that they are afraid to make an
effective speech." See also State v. Musick, 101 Mo.
274; State v. Phillips, 160 Mo. 507.

As to the charge that the crowd applauded at the
close of Mr. Clark's final argument to the jury, the
record shows that some of the audience began to ap-
plaud with their feet, but that at the first sound, the
court immediately ordered the sheriff to arrest every
person guilty of such conduct, and upon the sheriff's
reporting that he.was unable to tell what persons were
stamping, the court at once rebuked such conduct, and
commented upon the impropriety of such acts in a
courtroom at the time. These facts do not show any
dereliction on the part of either the judge or the sheriff.
It is not pretended that either had any intimation that
there were persons present who would show their ap-
probation of Mr. Clark's speech by stamping, and it is,
clear that it was promptly checked and rebuked. The
facts before us readily distinguish this case from
those in State v. Woolfolk, 81 Ga. 558, and Cart-
wright v. The State, 16 Tex. App. 473, 49 Amer. Rep.
826. In each of those cases the audience applauded the
opening address for the State, and the trial court ad-
ministered no reprimand, and then when the concluding
argument in the Woolfolk case was made, "from the
crowd in the rear of the courtroom came in an excited
and angry tone the cry, 'Hang him, hang him,' and
some of the crowd rose to their feet." The court then
rapped with his gavel and ordered the persons removed,
but certified he did not know whether his order was

obeyed.    The court found other reversible errors in the record, but added that it granted a new trial with less reluctance because of this conduct of the crowd, and the failure of the court to properly rebuke such acts.    SIMMONS, C. J., eloquently defined the duty of the trial court.    He said:    ''We think the judge should have stopped the argument of the State's counsel then and there and ascertained the guilty parties, and punished them to the extent of the law.    He should have taught them that the law was supreme; that the trial of a man for his life, however heinous the crime charged against him might be, was a serious and solemn thing, and that the law would not permit a mob to interfere, either by applause or by threatening and exciting cries.    By so doing he would have upheld the supremacy of the law, and would have shown the jury that whatever verdict they might find, the law would protect them.    It would also have shown them that the court was uninfluenced by the feelings or demonstrations of the crowd; that it was still able to administer justice and to give the accused a fair and impartial trial.    It would have given them a moral support, and would have tended to impress upon them the necessity of resisting such influences.''    To substantially the same effect is the language of Judge WILSON in Cartwright v. The State, supra.

To all of which we give our hearty assent and cordial concurrence, but we think a statement of the facts shows a radical difference between the occurrence at this trial and those upon which those opinions are based.

In this case no disorder or misconduct had occurred throughout the trial, and it was only after the last words of the prosecuting counsel had been uttered, that some of the crowd began to applaud with their feet. The record shows that instantly the trial judge interfered, ordered his sheriff to arrest the offenders, and then sternly rebuked such conduct.    What the *nisi prius* judge failed to do in the Woolfolk and Cartwright cases, he did.    Surely the jury were at once advised that such conduct was reprehensible in the extreme, and that they

were not to be influenced thereby, and we can not well see what more the court could have done. We think that the verdict should not be set aside for this momentary applause where no reflection can be made upon the court, counsel or jury and where no amount of vigilance would have prevented the occurrence.

VII.   It remains to examine the instructions given and refused. For convenience we will consider first those asked by defendant and refused.

The first is numbered 21 and prayed the court to instruct the jury that if the defendant killed Donegan in self-defense, they would acquit him, although they believed defendant afterwards took the money and property of defendant and converted it to his own use. The court had already given a most liberal instruction on the law of self-defense, numbered 14, and another numbered 18, in which it instructed the jury that even though it believed that defendant after the killing took the money and property of defendant, that constituted no crime for which he could be punished in this case, and that the evidence of such taking was only admitted in evidence for the purpose of throwing light, if any, upon the charge of murder in the indictment, and that they would not consider those facts for any other purpose. It thus appears that the court by its own instructions fully covered the law and committed no error in refusing defendant's said instruction numbered 21.

The instruction numbered 22 prayed by the defendant was as follows:

"22.   The jury are instructed that words as well as acts constitute in law a provocation for one person to assault another and thereby mitigate the crime, and if you believe that Donegan used words towards defendant which to your minds was a reasonable provocation for an assault by defendant upon Donegan, the defendant is not guilty of murder, but is only guilty of manslaughter in the fourth degree, and this even though you may believe defendant did actually assault said Donegan."

To appreciate the circuit court's view of the law, it

should be noted that in an instruction given by himself the learned judge had already instructed the jury that "if they believed from the evidence that the defendant struck and killed Donegan while he, the defendant, was in a violent passion, suddenly aroused by opprobious epithets or abusive words spoken by Donegan to defendant, then such striking and killing was not done with deliberation and was not murder in the first degree, but if not done in self-defense such a killing of Donegan by defendant in a passion aroused by such opprobrious epithets, willfully, premeditatedly and of his malice aforethought, was murder in the second degree."

In a word, the circuit court held that mere words, however opprobrious and insulting, would not be such a lawful or reasonable provocation as would reduce the homicide to manslaughter in the fourth degree, but only reduces the grade of the offense to murder in the second degree. Unquestionably this has been the general rule in this State for many years.

In 1 East's Pleas of the Crown, 233, it is laid down that, "Words of reproach, how grievous soever, are not provocations sufficient to free the party killing from the guilt of murder; nor are contemptuous or insulting actions or gestures without an assault upon the person; nor is any trespass against lands or goods."

"This rule governs every case where the party killing upon such provocation made use of a deadly weapon, or otherwise manifested an intention to kill, or to do some great bodily harm. But if he had given the other a box on the ear, or had struck him with a stick or other weapon not likely to kill, and had unluckily and against his intention killed him, it had been but manslaughter; for no malignant intention can be collected from such acts." [4 Blackstone's Com., 201; State v. Wieners, 66 Mo. 13.]

In Wharton's Criminal Law (9 Ed.) section 455, it is said: "Neither words of reproach, how grievous soever, nor indecent provoking actions or gestures, however much calculated to excite indignation or arouse the passions, are sufficient to free the party killing

from the guilt of murder. To have the effect to reduce the guilt of killing to the lower grade (manslaughter), the provocation must consist of personal violence.'' In State v. Starr, 38 Mo. 271, Judge WAGNER, speaking for this court, after adopting Wharton's statement above quoted, said: ''This rule is well established, and we imagine it would not be the part of wisdom to substitute in its place one fluctuating or less rigid, which would require the accused to be judged in each case according to the excitement incident to his natural temperament when aroused by real or fancied insult given by words alone. [Kely, 135.] There must be an assault upon the person, as where the provocation was by pulling the nose, purposely jostling the slayer aside in the highway (Lannusses' Case, 1 Hale P. C. 455), or other direct and actual battery (Reg. v. Stedman, Foster's Crim. Law, 292).''

In State v. Branstetter, 65 Mo. 149, this court unanimously approved Judge WAGNER's statement of the law on this point in State v. Starr, supra.

In State v. Hill, 69 Mo. 451, in discussing an instruction which declared that ''provocation, to be sufficient to mitigate or extenuate homicide, as applicable to this case should amount to personal violence or injury to the defendant, and mere words of reproach, how abusive or grievous soever they may be, are no provocation sufficient to free the party killing from the guilt of murder,'' this court said: ''The first clause of the instruction declares that no provocation will mitigate or extenuate a homicide, unless it amounts to personal violence or injury to defendant. The contrary was held in State v. Wieners, 66 Mo. 13, and while the court may not have intended, and probably did not intend to declare that no provocation less than personal violence or injury to defendant, would reduce the crime from murder of the first to murder of the second degree, but that no other provocation would reduce it to manslaughter, the instruction was so worded and constructed as to be calculated to mislead the jury.''

In State v. Kotovsky, 74 Mo. 247, this court said:

"Deliberation, as defined by this court, was not an essential element of murder at common law, but the man who in a passion, engendered by opprobrious words, or other just provocation, as contradistinguished from lawful provocation, slew the one who uttered them, at the instant, was deemed guilty of murder, although the passion engendered by the insult was as great as that produced by a blow, and yet the latter provocation reduced the homicide to manslaughter, while the other did not mitigate the offense.    Our statute declares murders committed by lying in wait, by poison, and in an attempt to perpetrate certain specified felonies, and all other willful, deliberate and premeditated murders, to be of the first degree, and all other kinds of murder at common law not herein declared to be manslaughter or justifiable or excusable homicide to be murder in the second degree.    Those murders committed in the heat of passion—engendered, not by what was legal provocation at common law to reduce a homicide from murder to manslaughter, but by opprobrious epithets or other insults, sufficient to arouse the same heat of passion which would be caused by a technical legal provocation—are of the second degree.    What is such provocation?    An insult to a person, either by accusing him or a member of his immediate family of some infamous act, opprobrious words, or indecent gestures, which convey imputations of criminal baseness against a person or his family, sufficient to arouse in a man of ordinary pride and self-respect a high state of passion and a spirit of resentment, are of such provocations, and the sufficiency of the provocation is to be determined by the court."

In State v. Elliott, 98 Mo. 150, this court again said: "The principle of law is too well established to admit of question that words alone, however provoking or insulting, will not reduce the killing to manslaughter. They alone do not furnish an adequate cause."

It would be a work of supererogation to cite all the cases in which this court has reiterated the statement that provocation consisting of provoking and insulting words, or opprobrious epithets alone, will not reduce the

homicide to manslaughter. We cite in addition to those from which we have already quoted: State v. Ellis, 74 Mo. 207; State v. Curtis, 70 Mo. 599; State v. Robinson, 73 Mo. 306; State v. Howard, 102 Mo. 142; State v. Bulling, 105 Mo. 204; State v. Martin, 124 Mo. 514.

Conceding that certain of our sister States have by their statutes so modified the law that insulting remarks concerning a female relative are made sufficient provocation, that fact only goes to prove that the general doctrine as uniformly announced by this court was the recognized rule at common law, and in those States until modified by statute, and to that extent only.

It follows that the circuit court did not err in refusing the instruction, and it was not error to refuse to permit the jury to determine for themselves whether such words were such reasonable provocation as would reduce the homicide to manslaughter. As a matter of law they were not and it was the province and duty of the court to so declare.

The instruction numbered 23, asked by defendant, was to all intents the same as number 22, as it merely specified the degrading epithets, and hence what has already been said applies with equal force to it. There was no error in refusing it.

As to instruction numbered 24, the court had already given the jury a proper instruction on circumstantial evidence and hence it was not required to repeat it. It was not true, however, that the case was wholly circumstantial. The defendant's own evidence and confessions corroborated as they were, fully established the *corpus delicti* and defendant's criminal agency in the killing of Donegan, the deceased.

The instruction numbered 25 was properly refused, because the court had given a full and exceedingly favorable instruction on the plea of insanity.

Instruction numbered 26 was given in the State's instruction numbered 13, and instruction numbered 27 was given in the court's own instruction numbered 18.

As to failure to instruct on good character, there was no proof that defendant was of good character, and

the statute does not and could not require a court to instruct upon a state of facts which the evidence does not warrant, as it would be a clear invasion of the province of the judiciary. [State v. Hopper, 71 Mo. loc. cit. 430-1; State v. Anslinger, 171 Mo. 600.]

The instruction defining murder in the first degree is such as we have for many years approved, and indeed is not assailed in this court.

While the instruction on murder in the second degree is challenged it is substantially the same as met the sanction of this court in State v. Gee, 85 Mo. 647, loc. cit. 649, and subsequently approved in State v. Nelson, 101 Mo. loc. cit. 469 and 470.

The instructions on reasonable doubt, the credibility of witnesses, the necessity of corroborating the confession of defendant, the presumption of innocence and self-defense were full and left nothing more to be said on this point.

One proposition only remains to be considered, and that is that the court erred in failing to instruct on all the law applicable to the case. It is now urged that the court should have instructed on manslaughter in the fourth degree, because the defendant's evidence in his own behalf tends to show that deceased had a wrench in his hand (as to its size and character there was no evidence) and was advancing on defendant to drive him from the cabin, when defendant slew him with the axe. It will be observed that according to his own unsupported evidence on the witness stand, the deceased had never struck or touched the defendant's person in any manner.

In State v. Sumpter, 153 Mo. 436, the facts were that defendant went into the field where deceased was plowing. The defendant testified that he rode up to the deceased and said to him, "Didn't I tell you I was going to kill you?" At this he said the deceased stopped his team, wrapped his lines around his plow handle, and started toward the defendant with an axe, whereupon he shot him. It was insisted the defendant was entitled to an instruction for manslaughter in the

fourth degree, but the circuit court refused it, and Judge SHERWOOD speaking for this court held it properly did so.

In State v. Smith, 114 Mo. 406, the evidence disclosed a case in which the issues raised were murder in the first degree or self-defense. Judge SHERWOOD again speaking for the court held that the trial court properly refused an instruction on manslaughter, citing State v. Sneed, 91 Mo. 559. To the same effect is the recent case of State v. Meadows, 156 Mo. 110; State v. Goddard, 162 Mo. 198, and State v. Reed, 137 Mo. 140. But we are cited to the State v. Matthews, 148 Mo. 185; but it will be remembered that in that case the defendant was defending his own premises, and had the right to repel force with force to prevent the tearing down and removal of his fence as the trespass was a forcible one. While it was held of course that he had no right to kill the trespasser merely because he tore down the fence, as was held after careful consideration in State v. Taylor, 143 Mo. 150, yet if while lawfully endeavoring to protect his property he was suddenly confronted with a deadly weapon in the hands of the trespasser, and shot to protect his life, he was guilty of no more than manslaughter, but it was for the jury under proper instructions to determine whether he killed the trespasser with express malice or in a heat of passion growing out of the endeavor to protect his property. The facts of that case are so essentially different from those in evidence in this case, that they furnish no precedent for holding the defendant guilty of manslaughter.

Here the provocation was opprobrious words and the exhibition of the wrench. If the jury found the defendant had reasonable cause to apprehend the deceased was about to kill him, or do him great bodily harm, and the danger was about to fall, he had the right to kill him, and he was guilty of no crime, not even manslaughter.

The facts of this case also distinguish it from State v. Garrison, 147 Mo. 548. In that case the threat

was accompanied by the throwing of a hatchet at defendant by deceased, an actual assault.

While there is language in State v. Grugin, 147 Mo. 39, which, in the absence of an understanding of all the facts, tends to support the contention of defendant that words of opprobrium alone are sufficient provocation, it is obvious that the learned judge who wrote that opinion confined his remarks to the exceptional facts of that case. He nowhere expressed any intention of overruling the long line of cases in this State to the contrary. He was dealing with the provocation suffered by a father over the outrage of his daughter, and the heartless and insolent confession, in effect, by the deceased, coupled with a threatened assault. The writer at the time thought the opinion should state that it was not our purpose to overrule the doctrine so long established in this State, and to that extent only dissented. [State v. Grugin, 47 S. W. 1066.] But that case is distinguishable from this.

Here the defendant, according to his own unsupported statement, and, we add, contradictory accounts of the homicide, was armed with a deadly weapon, an axe; the deceased he says had a wrench, what its weight or dangerous nature was is left entirely to conjecture. There is no evidence that defendant was laboring under such a passion from the epithets applied to him, that he slew deceased under a temporary dethronement of his reason. He alone of all who were present in the lonely cabin knew what transpired when he killed the deceased. In detailing the facts he gives not the slightest intimation that he was actuated by any impulse save that of self-defense from the threatened movement of deceased toward him with the wrench in his hand. If he was laboring under any undue passion when he struck the fatal blow, no trace of it is to be found in his testimony.

While doubtless there are many cases in which the facts justify not only an instruction on self-defense, but one for manslaughter in the fourth degree, we do not think this case required an instruction on any grade lower than murder in the second degree.

According to the testimony of the defendant, he only struck the deceased as he came to him, with the pole or helve of the axe.   This court has again and again ruled that neither courts nor juries are bound to accept testimony which is contrary to well-known physical laws or the common experience of mankind. The whole credible evidence in this case shows the head of Donegan, the deceased, was split open with the sharp edge of an axe or hatchet.   The wound was not such a one as could have been inflicted by striking a man with the handle or pole of an axe.   The defendant carefully refused to say he cut the deceased down with the blade of the axe.   What then becomes of the foundation for his claim that he slew the defendant upon a reasonable provocation.

The court, in view of the testimony of the physician who conducted the inquest and the other eyewitnesses who viewed the dead body, could reach no other conclusion that that the man had been slain with the sharp edge of the axe, and to reject as utterly incredible the story that defendant had struck him down with the pole of it, and likewise the story of the provocation.

The evidence of the robbery, the hiding of the dead body in the creek, the flight from the neighborhood, the attempt to destroy the evidence of the crime, all point unerringly to a cold-blooded, deliberate murder for the money which the defendant knew his victim possessed.

In our opinion the case called for no instruction on manslaughter in any degree.

This judgment should be and is affirmed.   All concur.