STATE of Missouri, Respondent,

v.

Perry Lester THRESHER, Jr., Appellant.

No. 48749.

Supreme Court of Missouri,

Division No. 1.

Oct. 9, 1961.

Virgil Conkling III, No. Kansas City, Robert E. Coleberd, Liberty, for appellant.

Thomas F. Eagleton, Atty. Gen., Daniel J. Leary, Sp. Asst. Atty. Gen., for respondent.

HOUSER, Commissioner.

█ Perry Lester Thresher, Jr., was convicted of first degree murder and sentenced to life imprisonment. Defendant appealed but filed no brief, so we examine the nine assignments of error in his motion for a new trial. Supreme Court Rule 28.02, V.A.M.R.

The information charged that on April 23, 1960 in Clay County defendant wilfully, premeditatedly, deliberately and of his malice aforethought assaulted, struck, hit and beat Constance Rebecca Williams with a stick of wood while attempting to perpetrate rape upon her, thereby inflicting a mortal wound from which she died.

█ Assignments one and nine (that the state did not make a submissible case on the charge of murder in the first degree) require a review of the evidence. The principals in this tragedy were Perry Lester Thresher, Jr., the defendant, a 19-year-old married man known to his friends as "Tarzan", and the victim, Mrs. Constance Rebecca Williams, referred to throughout the trial as "Beckie." Mrs. Williams, a young married woman whose husband was overseas, previously had been married to Bobby Lee Dayton, age 28, but that marriage ended in divorce. Those who participated in the events which led up to the death of Beckie, in addition to the principals, include Bobby Lee Dayton; one Charles Dobson; Carolyn Thresher, wife of defendant, and Fay Carrol Thresher, 16-year-old sister of defendant. The state introduced evidence tending to show these facts: Early on the afternoon of April 22, 1960 Dayton and defendant were at the home of friends in Kansas City. Dayton asked defendant to call Beckie by telephone and ask her to meet Dayton. Defendant refused but defendant's wife agreed to and did make the call. Beckie met Dayton in response thereto.

Beckie and Dayton left the house together and were gone for an hour. They returned, picked up defendant and Dobson, and the four went to Mickey's Tavern on 27th Street. From then until about 11 p. m., except for intervals when one or more of them would leave the group, these four (defendant, deceased, Dobson and Dayton) were together, traveling from place to place in automobiles, and drinking in taverns. During that period all of them did some drinking of beer and whiskey. Defendant drank "mostly beer all afternoon", and three shots of whiskey. They ate very little food. Dayton left the group before 11 p. m. and did not return. Between 11:30 p. m. and midnight defendant, deceased and Dobson went to the home of defendant's mother. There Beckie prevailed upon Fay to go with them, saying that she was "scared" and did not want to go by herself. Defendant, deceased, Dobson and Fay drove to a tavern, where the men bought six cans of beer. Then they drove to the "drag strip", where they remained for 15 or 20 minutes. At this stage defendant "was about passed out." Thereafter the four drove to the city dump in Clay County. Dobson and Fay were in the front seat; defendant and Beckie in the rear. Dobson parked the car and turned off the lights. Beckie suggested that they get out of the car and walk around a little. As defendant and Beckie left the car she turned the radio on full blast. The two started walking toward the river, leaving Dobson and Fay in the car. A few minutes later Fay and Dobson heard a scream. They turned the radio down, started the car and drove in the direction of the scream. Using the flashlight they tried to locate Beckie and defendant, but failed. They parked the car again, waited a while (perhaps as much as five minutes), and then heard another scream, and then another. They got out of the car and Dobson said "It sounds like it's coming from the railroad track." They turned the flashlight on and ran to a level spot by a wooded area. There they discovered Beckie, lying on her back on the ground with nothing on but a brassiere and

the long pants (pedal pushers) which she had been wearing. These pants were pulled down. Defendant had torn the woman's clothes "off of her." She was lying on her white panties, which were "all torn" in small pieces. Defendant was lying on top of Beckie. He had no shirt on and his pants were down to his knees. Dobson started to turn around and walk away. He thought they "were just having an affair." Defendant jumped up and said "I hurt her * * * I must have hurt her." Dobson walked closer, where he could see better, and noticed that Beckie had blood on her face and shoulders. Her eyes were "just a little bit open and her mouth was open * * * and she was moaning * * *." Dobson asked defendant why he hurt her and defendant said, "She bit me." Dobson asked defendant what he hit her with and defendant replied, "A stick." Defendant said, "We have to take her to a hospital." Fay was told to grab Beckie's shoe and purse. Defendant picked Beckie up in his arms and started carrying her to the car. Dobson walked alongside carrying the flashlight. Beckie was bleeding and there was blood on defendant's chest. Beckie slipped out of defendant's arms "because she was all bloody" and went to the ground. Fay said that when she fell to the ground she struck her head on a "level" rock, but Dobson did not see Beckie strike her head on a rock and saw no rock on the ground. Dobson said she "slipped" out of one of defendant's arms and "went down to the ground easy." Dobson then helped defendant carry Beckie to the car. No effort was made to put her clothes back on, but at defendant's request Dobson took off his shirt and wrapped the shirt around her. The men then threw the beer cans out of the car and drove to a hospital. At about 2 a. m., April 23, she was examined by a doctor, who found her partly clad, bleeding severely, unconscious, and choking on her own secretions. She never regained consciousness. Suction therapy was instituted to maintain an air passage and keep her alive. She had four deep lacerations on the right side of her head, a

minor laceration behind the ear, a laceration on the ear. She was bleeding from the nose, mouth and ear, and was severely bruised about the left side of the head, eyes and left shoulder. She was suffering from increased intracranial pressure or contrecoup hemorrhage. She required the care of a neurosurgeon and none being available at that hospital, was sent to General Hospital. At the first hospital, after the police arrived, defendant told the police "It was all my fault. She bit me and I hit her"; that he did not know what he hit her with, "He'd picked up something and hit her." He said "He did it"; that he had torn off her clothing, and several times stated "It's my fault, and take me down, I'll pay for what I've done." The officers smelled alcohol on his breath. At the hospital a detective asked defendant what happened to the victim. In answer defendant said "he had struck her with a piece of wood. I asked him why she had bitten him, * * * and he replied that he wouldn't answer, that he didn't want to say anything that would hurt her reputation." At 3:55 a. m. Beckie was examined at General Hospital by a doctor who found her in shock, unconscious, with lacerations of the scalp, contusions and bruises of the face, and evidence of a head injury. She lived about one minute. An autopsy revealed that the cause of death was massive skull fractures, cortical contusions, cerebral lacerations, and a large blood clot between the bone and the brain. In the opinion of the doctor in charge of the autopsy death was due to injuries received between 11 p. m. April 22 and 2 a. m. April 23, 1960, and that the striking of the deceased with a stick by the defendant could have caused her death. The police took Dobson from the hospital to the scene at the city dump. There they found a stick or wooden tree limb about 20 inches long and 1½ inches in diameter. Shown to defendant the latter stated that the piece of tree limb looked like the stick he hit the deceased with. Photographs were taken at the scene. Beginning at 5 a. m. April 23 a confession was taken from defendant, typed in question and answer form and signed by defendant. That afternoon defendant signed another statement at the Clay County Courthouse. The statement taken in the early morning, in the office of the homicide unit of the Kansas City Police Department by Detective Louis Roberts, in the presence of Sgt. John Garnett, showed that after having been advised of his constitutional rights and informed that he was not required to make a statement and was entitled to consult friends and attorney, defendant was willing to waive these rights and make a statement with reference to the fatal beating, knowing that it could be used in court against him in the event of a trial. It further indicated that defendant had known Beckie quite a while, almost two years; that she had stayed at the home of defendant and his wife; that he did not know why "he tried to f... her"; that he guessed it was because of Dayton; that one day Dayton had relations with Beckie in his house "practically in front of us," and "I guess that is why I tried to get her because he did and I thought I could too." Defendant further stated that Beckie and Dayton left Mickey's Tavern together on the afternoon of April 22; that Dayton "took Beckie somewhere and when he came back he was bragging about how he did it to her. I guess that's what gave me that crazy notion." Defendant stated that after they arrived at the dump that night "She wanted to get out and go walking. I was in a daze and kept stumbling around. She got cold so I took off my shirt and put it around her." They got to talking about her and her former husband and sat down on the ground.

"A. All I can remember is her biting me on the arm.

"Q. What happened after she bit you? A. Oh, I was mad and I hit her.

"Q. What did you hit her with? A. Something laying around. Just a stick. She had hold of my arm and was scratching me and everything.

**6**

"Q. What did she do after you hit her? A. She said, 'You mother f.......'

"Q. Did she fall down when you hit her? A. No, sir, she was already down.

\* \* \* \* \* \*

"Q. I am going to show you a piece of a tree limb and ask you if this is the stick you hit her with? A. It looks like it.

"Q. Will you scratch your initials on it for identification? A. Yes, sir." (scratches initials P.L.T. on club)

The statement given to the Sheriff of Clay County related the following version of what happened: "We stopped and sat down. Beckie layed down on her back. She said Bobby had held her down and had a sex relation with her and I said 'Like this?' And that is all I remember until my sister called and said she was ready to go. \* \* \* Q. Did you strike her? A. I don't remember striking her but I must have because there wasn't anyone else around."

▮ The foregoing facts, together with the reasonable inferences to be drawn therefrom, made a submissible case of homicide committed in an attempt to perpetrate rape which, by force of Section 559.010 RSMo 1959, V.A.M.S., is deemed murder in the first degree. There was ample evidence from which the jury could find beyond a reasonable doubt the fact of Beckie's death; the criminal agency of someone other than the deceased causing the death, and that defendant administered fatal blows to the head and body of the deceased in an attempt to rape her. The corpus delicti was sufficiently proved, thus rendering the extrajudicial admissions and confession of defendant clearly admissible. Defendant's admissions and confession were sufficient to complete the case against him. From the direct and circumstantial evidence, and the extrajudicial statements of the defendant the jury could find beyond a reasonable doubt that defendant knew that Beckie had continued to maintain illicit relations with her former husband after her divorce and remarriage; that this aroused in him a lustful desire to secure her favors; that with their inhibitions released by the prolonged drinking spree in which they had engaged that afternoon and evening, defendant attempted to have intercourse with Beckie when they were alone together in a dark and secluded place; that she resisted, screamed, called him a vile name, held his arm, scratched and bit him; that he became angry, struck her on the head a number of hard blows with a stick, blows which rendered her unconscious and reduced her to a state of submission and eventually produced her death; that he then tore off her clothes, pulled down his pants, got in position and was about to perpetrate a rape upon her prostrate body when interrupted by Dobson and defendant's sister. Upon proof of homicide committed in an attempt to commit rape the law supplies the essential ingredients of murder, namely, malice, premeditation and deliberation. State v. Cole, 354 Mo. 181, 189 S.W.2d 541, and cases cited. There was substantial evidence to support the verdict of the jury.

▮ Exhibits 1 and 2, photographs of that area of the city dump where Dobson and Fay found defendant and Beckie on the ground, were properly admitted in evidence as against defendant's objections that they were not properly identified; prejudicial in that they did not tend to connect defendant with the crime and showed a spot which the jury could have speculated was a blood stain; threw no light on any material issues; were no evidence of defendant's activities; and did not tend to establish the conditions existing at the place of the alleged crime. At the request of Detective Roberts, Dobson took the officers and Harry Hicks, a photographer connected with the Kansas City Police Laboratory Corps, to the scene of the crime. There Hicks took the pictures Exhibits 1 and 2, which show the surrounding ground, the grass, some tree trunks, sticks, limbs and twigs, a beer

can and some dark spots. Dobson, present when the photographs were taken, stated that Exhibits 1 and 2 were fair and accurate representations of the scene of the events to which he had testified. Detective Roberts, present when the pictures were taken, identified them as pictures of the area pointed out by Dobson. The identification was sufficient. Demonstrative evidence of this kind is admissible if it throws any relevant light on a material matter at issue. State v. Moore, Mo.Sup., 303 S.W. 2d 60 and authorities cited, loc. cit. 65. These exhibits, showing that at the scene there were numerous clubs and sticks of the size and kind that defendant said he used to beat Beckie, would be material in support of defendant's admission that he hit Beckie with a stick, to show that the parties were at a place where numerous sticks and clubs were lying around handy, in easy reach of the defendant, and to illustrate the conditions existing at the place of the crime, including the fact that the scene of the crime was a lonely, secluded area. In view of the evidence of the considerable amount of blood which Beckie lost, the dark spots in the pictures were proper for the jury to consider. The trial court properly exercised its discretion in admitting Exhibits 1 and 2.

■ Exhibits 6 and 7, photographs of the upper body and head of the deceased, taken after her death at General Hospital by a member of the Kansas City Police Department, were properly admitted in evidence as against defendant's objections that they were inflammatory and gruesome; that they did not tend to connect defendant with the crime; that they threw no relevant light on any material issue; that they did not show what change occurred in the condition of her head before and after her head was struck on the rock mentioned in evidence; and that there is nothing to show that the condition revealed was not caused by the fall. A doctor had shaved away the hair and the pictures revealed five large, wide, open lacerations. The purpose of Exhibits 6 and 7 was to show the nature, extent and severity of the blows administered to the head of the victim. These photographs were material to the state's theory that blows were struck with a large wooden stick wielded by defendant of sufficient force and violence to fracture the skull of the deceased and to cause her death, and they tended to negative defendant's suggestion that Beckie's fall from the defendant's arms may have caused her death. "It is proper to show the condition of the body of deceased * * *; the existence of wounds, their nature, location, * * * appearance, * * *." 40 C.J.S. Homicide § 248, a. (2), p. 1191. Even if the pictures were inflammatory and gruesome, as contended, it is not a sufficient cause for their rejection that the sight of them would tend to agitate the feelings of the jurors, if the exhibits satisfy the rule as to the admission of demonstrative evidence. State v. Moore, supra, 303 S.W. 2d loc. cit. 66, and cases cited; State v. Laspy, Mo.Sup., 298 S.W.2d 357, loc. cit. 361, and cases cited. The trial court properly exercised its discretion in admitting Exhibits 6 and 7.

■ Exhibit 11, a stick of wood approximately 20 inches long and 1½ inches in diameter, found at the scene of the crime by Detective Roberts within three hours after the commission of the crime, was properly admitted in evidence over defendant's objection that it was never properly identified as having been used by defendant. "Subject to the qualifications of relevance and identification, instruments employed by the defendant in the commission of a crime are admissible in evidence to show the nature of the instrument used." Wharton's Criminal Evidence, Vol. II, § 677. Defendant objects that no laboratory tests were made for fingerprints, blood, hair, or flesh on the stick, and that there were many other sticks of wood of similar size and dimension at the scene. No such identification was necessary in view of the fact that defendant himself sufficiently identified Exhibit 11. Exhibited to him and asked if that was the stick with which he hit her,

defendant said "It looks like it." Then defendant scratched his initials (P.L.T.) on the stick for identification. This was sufficient to authorize the admission of the stick in evidence to illustrate the type and kind of weapon used. In State v. Reeves, Mo., 195 S.W. 1027, loc. cit. 1031, this Court, passing upon the admissibility in evidence of an iron bar and a piece of board which where said to have been found at or near the place where the homicide occurred, said, 195 S.W. loc. cit. 1031: "The deceased was killed by some implement of that character, and, as these things were found at a place where they might have been used, and Byrd said he saw something like the iron bar in Steve's hand that night during the fight, there was no error in allowing them to be introduced in evidence for what they were worth. State v. Gartrell, 171 Mo. 489, loc. cit. 507, 71 S.W. 1045."

■ Dr. Charles Wheeler examined the autopsy report, conferred with the doctors who actually performed the autopsy, examined some photographs and slides of the organs of the deceased taken at Dr. Wheeler's direction, and examined the organs of the body after they had been removed. Defendant assigns as error the action of the court "in permitting Dr. Charles Wheeler to testify in response to a purported hypothetical question propounded by the state that the injuries to deceased's head if caused by being struck by a stick of wood could have produced death." Defendant urges that the doctor was not qualified to answer the question and give an opinion because he merely examined the organs and did not view the body of the deceased, and that the hypothetical question invaded the province of the jury and was therefore prejudicial. We find no error in either respect. The record indicates that Dr. Wheeler was well qualified by education, training and experience, and we find him qualified to testify as a medical expert on the subject matter under consideration. The state had a right to frame a hypothetical question upon its own theory of the facts. State v. Francies, Mo.Sup., 295 S.W.2d 8. The question carefully delineated the principal facts upon which the state relied, including the act of defendant in striking the deceased about the head with a stick. It was the doctor's opinion that, assuming the truth of the facts hypothesized, the injuries received caused damage to the brain which in turn caused the death. The hypothetical question as framed did not invade the province of the jury, but properly called upon the witness as an expert to express an opinion upon a matter as to which he was qualified, based upon sufficient means of knowledge.

■ Defendant assigns as error the introduction into evidence of Exhibit 13, the confession taken by the Kansas City Police Department, because "the statement was obtained about four or five hours after the alleged crime, * * * when defendant was suffering from the effects of excessive drinking and at a time when his eyes were bloodshot, he smelled of liquor, and his balance was not good." The officers who took the confession indicated that while defendant was partially under the influence of intoxicants, he was not affected to the point where he did not know what he was doing or saying; that he was not drunk at the time the statement was taken, but appeared to know everything he told the officer; that he was cooperative and appeared to be anxious to "get it off his chest and tell his story." Under this evidence the jury could find that defendant had sufficient mental capacity to know what he was saying. "The fact that accused was more or less intoxicated when he confessed does not exclude the confession if he had sufficient mental capacity to know what he was saying." State v. Smith, Mo.Sup., 342 S.W.2d 940, loc. cit. 941, quoting from 22 C.J.S. Criminal Law § 828, p. 1452.* But defendant makes the point that he was a 19-year-old boy, not represented by counsel, with no member of his family present, in police headquarters,

* Now 23 C.J.S. Criminal Law, § 828, p. 229.

in the presence of policemen and no one else, and was not advised of his constitutional rights until after he had been partially interrogated and had answered several interrogatories. There is no contention that he was denied counsel or the right to have an attorney or a member of his family present, or that he was never advised of his constitutional rights. In the confession defendant acknowledged that he was advised of his constitutional rights; that he did not have to make a statement, and that he was entitled to consult with friends or attorney, but that he waived those rights, and agreed to make a statement about the affair, knowing that it could be used in court against him. The only questions put to defendant before he was informed of his constitutional rights pertained to his name, age, birthplace, residence address, persons with whom he lived, and his place of employment. No questions relating to the crime, or any of the events leading up to the crime, were asked before defendant was apprised of his constitutional rights. There is no intimation that the confession was obtained by force, duress, promise of reward or leniency, or other improper means. The evidence is overwhelming that the confession was given freely and voluntarily. There was no prejudice to the rights of defendant under these circumstances. The court did not err in receiving Exhibit 13 in evidence.

 Defendant's next assignment is error in admitting in evidence Exhibit 14, the statement given the Clay County Sheriff's office on the afternoon of April 23, 1960, and particularly the underscored part of the following answer: "Q. Did you strike her? A. I don't remember striking her, but *I must have because there wasn't anyone else around*," because this "is merely a conclusion, a guess, a speculation on the part of the defendant and not admissible in support of the alleged crime charged in the information." The admission of the last part of the answer " * * * there wasn't anyone else around" was proper. This was a statement of fact, admissible

under the rule that "Any statements made by a defendant, which tend to incriminate him and connect him with the crime charged, are admissible when voluntarily made." State v. Sinovich, 329 Mo. 909, 46 S.W.2d 877, 881. Under the ruling in State v. Tyler, Mo.Sup., 306 S.W.2d 452, 456, there is a serious question whether defendant properly objected to the part deemed inadmissible, but assuming (not deciding) that the "I must have" part of the answer was inadmissible, it was harmless. Defendant, taken by surprise in the act of attempting rape, instantly volunteered that he had hurt Beckie; and positively stated that he had hit her with a stick. Again, at the hospital, defendant told the police repeatedly that he "did it"; that it was his fault, and that he would pay for what he had done. Shortly thereafter, at the police station, he made a voluntary statement which was reduced to writing in which he positively, unequivocally and in detail related the facts of the beating, and identified the kind of club he used. Under these circumstances defendant was not prejudiced by that part of his answer that he "must have" struck her.

 Finally, defendant assails Instruction No. 8, the verdict-directing instruction on murder in the first degree, on five grounds. None of the complaints is meritorious. The first paragraph properly instructs the jury on the law, that homicide in an attempt to perpetrate rape is deemed murder in the first degree and that upon a finding that such a homicide was committed, the attempt to perpetrate rape stands in lieu of deliberation and premeditation and warrants a finding of murder in the first degree. The first paragraph is not subject to the complaint that it states conclusions of law and authorizes a verdict but fails to hypothesize facts. The facts necessary to be found to authorize a conviction are properly hypothesized in the second paragraph, which is not erroneous for failure to define the term "credible evidence." That term is sufficiently plain and meaningful and does not require definition. Nor does the second paragraph instruct the jury on a crime

not charged in the information, namely, attempt to ravish and carnally know, as alleged. As a predicate to a finding of attempt to perpetrate a rape the jury was required to find that defendant "wilfully, and feloniously did forcibly and against the will of * * *, make an assault upon her, the said * * * and feloniously and forcibly and against her will attempt to ravish and carnally know her, * * *." The wording objected to is descriptive of the elements of the crime of attempt to rape, is consistent with the statutory definition of rape contained in Section 559.260 RSMo 1949, V.A.M.S., and properly predicated the finding required to be made by the jury in order to convict. There was no deficiency in not requiring a finding that the offense was committed "in spite of her utmost resistance." The "utmost resistance" doctrine has no application where the woman's will is overcome by personal violence, or by putting her in fear of personal violence. State v. Moore, Mo.Sup., 143 S.

W.2d 288, and cases cited, loc. cit. 289. Nor was there a failure to define the words "attempt to perpetrate a rape." On the contrary, these words were sufficiently defined by the predicate above quoted.

A painstaking review of this entire record reveals no reversible error. Defendant, represented by capable lawyers, was accorded a fair and impartial trial. The verdict is proper in form and substance; the punishment is authorized by law, Section 559.-030, RSMo 1949, V.A.M.S.; allocution was granted; the judgment is proper in form and substance, and sentence was duly imposed. The judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.