Ernestine KAHN, Plaintiff-Appellant-Respondent,

v.

William J. PRAHL, d/b/a J. A. Prahl Contracting and Building Co., Defendant-Appellant-Respondent,

v.

FAIRELL, INC. (Formerly Wabash Drilling Company), Third-Party Defendant-Appellant-Respondent.

No. 52139.

Supreme Court of Missouri, Division No. 1.

April 10, 1967.

Motion for Rehearing or to Transfer to Court En Banc Denied May 8, 1967.

Walter S. Berkman, St. Louis, and Roberts P. Elam, Clayton, for appellant, Ernestine Kahn.

Barnard, Timm & McDaniel, St. Louis, for appellant-respondent, William J. Prahl, d/b/a J. A. Prahl Contracting & Building Co.

Heege & Heege, Clayton, for third party defendant-appellant-respondent.

HIGGINS, Commissioner.

Ernestine Kahn, as plaintiff, sued her general contractor, defendant William J. Prahl, doing business as J. A. Prahl Contracting and Building Co., for $50,000 damages for breach of contract; Prahl, as third-party plaintiff, sued his subcontractor, third-party defendant Fairell, Inc. (formerly Wabash Drilling Company), for the amount of any judgment which might be entered against him on plaintiff's petition. A jury found the issues for plaintiff and assessed her damages at $50,000, and the court declared a mistrial. On November 22, 1965, plaintiff moved to set aside the declaration of mistrial and for reinstatement of the verdict and, on December 17, 1965, the court sustained that motion, set aside its declaration of mistrial, reinstated the jury verdict, and entered judgment for plaintiff against Prahl for $50,000 and for Prahl against Fairell in the same amount. Motions for new trial of Prahl and Fairell were sustained and all parties have appealed.

Plaintiff alleged that on September 12, 1957, she, as owner, and Prahl, as contractor, entered into a general contract for construction of an 18-family apartment building in accordance with plans, drawings,

and specifications prepared by architect Cay Weinel; that she agreed to pay and did fully pay the contract price; that the specifications required that all holes for construction of concrete piles or piers be "drilled to refusal," and that the bases of said piles or piers be "belled" or widened; that such holes were not "drilled to refusal," and the piles or piers were not "belled," and that Prahl thereby breached the contract; that as a result of the breach, the piles or piers were unable to support their designed building weight, were caused to sink unevenly below the levels to which their holes were drilled resulting in cracking and sagging of walls, tiling, floors, and ceilings in various parts of the building, to plaintiff's damage in the amount of $50,000.

Prahl, in answer, admitted the contract and specifications, denied the alleged breaches, and alleged that all drilling was done in accordance with plans and specifications.

Prahl, as third-party plaintiff, alleged that on September 23, 1957, he, as general contractor, and Wabash, as subcontractor, entered into a subcontract for Wabash to furnish labor and equipment for machine drilling of the pier holes, including belling according to the plans and specifications in the general contract; that if the pier holes were not drilled to "refusal" and the piers were not "belled" as required by the plans and specifications, thus rendering Prahl liable to plaintiff, then Wabash, as third-party defendant, was liable to Prahl as third-party plaintiff for the amount of Prahl's liability to plaintiff.

Fairell, in answer to Prahl's third-party petition, admitted that, while known as Wabash Drilling Company, it entered into the subcontract with Prahl, alleged full compliance with the contract, and denied liability to plaintiff or to Prahl.

Ernestine Kahn, aided by her son, Charles Kahn, employed Cay Weinel, an architect, to prepare all plans and specifications for an 18-family apartment building to be located on her property at 800 South Hanley Road, Clayton, Missouri. The building was a 3-story and basement, "]" shaped, reinforced concrete, fireproof building, located on the east side of Hanley Road, with the wings or arms of the "]" projecting to the west. A basement garage extended to the west beyond the westernmost wings and was covered with earth for a lawn.

The construction contract, executed September 12, 1957, by Mrs. Kahn as owner and Prahl as contractor, required the contractor to "furnish all of the materials and perform all of the work shown on the Drawings and described in the Specifications * * * and addenda #1 and addenda #2 prepared by Cay Weinel, Architect, * * * and * * * do everything required by this Agreement, the General Conditions of the Contract, the Specifications and the Drawings" for $400,447.50, not including some 17 items such as air conditioning, plumbing, wiring, fixtures, oak flooring, terrazzo, appliances, etc. The specifications provided: "All drilling for piles shall be included by the Contractor," and "Piles are to be constructed and reinforced in accordance with Engineering Drawings." Addenda #1 provided: "The average depth of the drilled piles from the top elevation given on the drawings to the bottom shall be 15'-0"," and "A Unit price per foot shall be given for any additional average depth or credit for lesser depth." The first floor framing plan in respect to piles provided: "20. Piles to be drilled to refusal."

The foundation plan was prepared by the architect and by Louis Krasner, a structural engineer. It called for 170 piers or piles to be drilled and provided: *Unless Noted Otherwise All Piles Under Walls* to be 18" $\phi$ with 6—#5 (vert.) $\phi$ #2 ties at 18" c.c. Piles to be belled where shown. Unless indicated otherwise—bells to be 30" $\phi$. (52 thus) under walls." The foundation plan also denoted typical 18" piles with no bell by small circles, and typical 18" piles with 30" bells by similar small circle surrounded by a larger concentric circle. Some

of the piles were shown to be of 24" diameter with 42" bell. The bell at the bottom of the pier or pile is a flaring or broadening of the base to provide additional support. The details section of the foundation plan shows typical exterior wall and garage column sections, with the former carrying the legend: "See fdn. (foundation) plan for piles to be belled & size of bells."

By the subcontract between Prahl and Wabash, Wabash agreed to furnish Prahl with "labor and equipment for machine-drilling foundation piers for Ernestine Kahn Apartment located at 800 South Hanley Road according to plans or directions by Cay Weinel, Architect * * * price ($2380) to include machine-drilling and machine-belling for foundation piers according to plans and specifications and Addendum No. 1." Unit prices were also stated for 18" and 24" piers.

Prior to letting the general contract to Prahl, plaintiff employed Wabash to perform test drilling and the results were given to Mr. Prahl and to the architect.

The building was completed and ready for occupancy about November 1, 1958. About two and a half months before that, Mr. Prahl observed that one of the piers in the garage underneath the lawn had sunk; it ultimately sank approximately seven inches and the garage ceiling sagged the same amount. At that time, Charles Kahn "began to notice cracks in nearly every apartment throughout the entire building, cracks in the hall, terrazzo stairways, in the garage, sinking of piers * * *."

The E. F. David House Moving Company, specializing in moving, shoring and underpinning buildings, was consulted by plaintiff in July or August 1963. Inspection was made by Lloyd M. Davids, a registered engineer. He noted cracks in the brickwork and inner partitions, distortion in the garage ceiling, plaster cracks, and foundation cracks. He found the building "to be settling as a result of a condition of the subsurface material below the footings," and concluded "there was insufficient resistance of the subsoil materials below the footing elevation." That company recommended and installed 13 concrete piers "to sustain the walls within certain isolated areas." The underpinning work was done by hand excavation alongside the sunken piers "until we encountered subsurface material which in our opinion was sufficient to receive spread concrete footings." Then "we proceeded and built a form, poured concrete into the form, and the end result was the compressive load of the column was refused by this pier that was installed in direct compression." David's hand excavations varied between 5 and 14 feet below the bottoms of the piers drilled by Wabash; ten of such hand excavations were 11 feet or more below the drilled piers; all rested on different material than did the drilled piers. This work cost $8,482.56.

■ The principal conflict in the evidence went to the meaning of "drilled to refusal" in connection with whether the drilled piers were "drilled to refusal," and whether such piers were "belled," all as required by the plans and specifications; and, since plaintiff had a verdict, she is entitled to have the evidence viewed in the light most favorable to her. Christie v. Gas Service Co., Mo., 347 S.W.2d 135, 137 [1].

Eugene Brucker, an engineer, specializing in soil mechanics and foundations, inspected the building's underpinning in 1963 while the E. F. David Company was working there. None of the piers he observed were belled and they "were not drilled to what we would consider refusal material." One such pier, located in the northwest corner of the building, rested on a "yellow, silty clay" and was not "belled" as required by the plans and specifications. "One pier in particular was pointed rather than having a flat bottom as normally a pier would be." Mr. Brucker stated that the term " 'refusal,' when in reference to the support of a building would be the material which is strong enough to support it.

Frequently this would be limestone or material which is solid from there on down. Basically, an unyielding material as far as supporting capacity is concerned." He thought that this building in Clayton, Missouri, should have been piered to Cherokee shale, "a firm, hard, reddish material," all the way around. Where he observed David working he saw no strata of limestone at 13 to 15 feet; he did see some gravel which they went through. In respect to a driller's operation, he stated on cross-examination that "refusal" meant "to a material at which he can no longer penetrate, below which we would assume, or know from one way or another, that this material is solid and unyielding and sufficient to support the intended load of a structure. * * * If I would designate piers to refusal, I would not expect this man to drive this machine to get hung up on a branch or a log, and say, 'I can't go any further.' I would anticipate that he would take this hole, by one means or another, to a point at which this material was satisfactory for bearing an intended structure." He would prefer specification of an elevation to which piers should be drilled, and he did not disagree with the engineering definition of "refusal" in Webster's Dictionary, "A stoppage of a bolt or pile, etc., because of resistance greater than the driving force." In answer to whether the plans called for a belled pier at one particular location where an unbelled pier was observed, "my interpretation of the plans, as I would read them, would indicate that the bell was required on that particular location."

When the David Company did its work, Mr. David found bells at the bottom of some of the piles he examined, and it was his opinion that materials he found at the bottom of those piers constituted refusal. When his company dug alongside existing piers he could see what was supporting their bottoms, and, as to whether it constituted refusal, he answered, "if limestone can be considered refusal, they were on refusal." In one instance David dug by hand to 25 feet in depth for refusal; the machine-drilled pier was dug to but 13 feet. All of his holes were dug to refusal.

Another consulting engineer, Henry M. Reitz, inspected the premises for Mrs. Kahn during the work performed by the David company. He observed one of David's underpinning holes and, in answer to whether the pre-existing pier had been drilled to refusal, testified: "By shape and somewhat by color, the pre-existing pier was visible in the east side of the excavation * * *. The elevation * * * was well above the bottom of the excavation that David was making for the new pier immediately adjacent to it. * * * the nature of the materials that had been dug out * * * could be noted. In any of those stockpiles I could not see any signs of course (sic) gravel, rock, or anything else. * * * The base of the pier that David was digging, (was) quite dry, quite firm material that had a characteristic terra cotta type color that is generally found in this part of the St. Louis area; and is something that is assumed to be a most suitable foundation material for this type building. * * * the material at the base of the drilled pier was a light color; it was not dry, it was not as firm; it would not have as much strength as the material that the David work had reached." By his interpretation of the plans and specifications the Wabash pier had not been "drilled to refusal" which he defined as meaning "drilled to a hard, resistant strata which would support the loads that will be applied to it." The pier was not belled. He also examined the Wabash test drill report which showed that the first hole went to 25 feet without finding refusal; the second hole went to 25 feet "past some limestone and boulders and still no refusal," and the third hole found shale refusal at 22 feet. In his opinion the reason the building settled "was an excessive amount of differential movement between interior and exterior walls, and along exterior walls, which would be a non-uniform degree of support under the structural portion of the building. * * My opinion is that the great majority, if not all of the cracks that were visible when

I looked at the building in 1963, were the result of insufficient support from the foundation, which, since the foundation was made up predominantly of drilled piers, would mean that movement had to be in the drilled piers. The drilled piers were concrete within their depth and, therefore, the movement would be beneath the base of the drilled piers * * * due to the material upon which the building was built, rather than the materials that went into the building * * *." This witness recognized that the plans did not specify a meaning for "refusal," and stated that the term had a definite meaning in the trade; that the responsibility of a machine operator would be met if his drill refused to penetrate further, but when previous information on the area is available, the operator's actions in stopping his drill alone would not meet the obligation of the plan.

Defendant Prahl and third-party defendant Fairell put on their version of "drill to refusal" in dispute of plaintiff's case. Generally, their theory was that the term meant to drill until the bit of the mounted rig refused to penetrate further, ceased to bring up drilled material, or ceased to rotate. Their witnesses recognized that refusal to penetrate further could be caused by a rock the size of a baseball, a 4″ cube of rock, small rocks, a log, a small rock upon which a drill came to rest, etc. They also testified that a drill bit and rig will "chatter" and rise up when it "reaches refusal."

The contractor, William J. Prahl, testified that he knew the contract called for him to drill piers to refusal and that the 15-foot figure did not mean the depth he was to drill. He said "drill to refusal" in his business meant when the bit on the rig stops, comes up empty, and he so construed the plans. He said the piers on his job were dug to refusal. He saw quite a few piers belled when belling was done.

Prahl's superintendent, Oliver Haas, stated his understanding of "drill to refusal" to be met whenever the drill would not penetrate further with all pressure on the drill, and when it did not bring up any more dirt. He stated that Louis Krasner gave him permission to pour the main pier under the garage when he reported to him that his drill was not going down as deep as he thought it should. Mr. Haas stated that all piers were drilled to refusal and that all piers were belled where required.

Herbert R. Sprinkle, a driller and foreman for Wabash on both test and pier drilling on the Kahn job, Herbert Howard Ellyson, James Leo Mudd, and Walter Louis Schatz, Wabash drillers on the Kahn piers, all testified to the effect that Wabash drilled the Kahn piles to "refusal" according to defendants' theory of "refusal." None could remember whether they belled any piers.

Fairfield Elliott, former owner of Wabash, now known as Fairell, Inc., also interpreted "drill to refusal" to mean to where a drill will no longer penetrate. He said that in plans calling for drilling to refusal the owner takes the risk.

Fairell, Inc., presented Neal J. Campbell, a graduate engineer specializing in building work, who stated the purpose of test holes to be that of guiding the engineer in determining soil pressure he would use and type of foundation he would specify. His definition of refusal for a drilled pier was that of the trade when the full weight of the machine is put on the drill and it stops. In his opinion the piles on the Kahn job were drilled to refusal.

The evidence on damages came from Charles Kahn who had been in the real estate mortgage business since 1936, appraising and evaluating properties. He also had built commercial buildings. The actual cost of the completed building, exclusive of land valued alone at $50,000, was $705,000. He stated that as of the date of completion the land and building would have had a fair market value of $700,000 if it had been completed according to plans and specifications; that such had a fair market value of but $650,000 as the building was actually completed; that the faulty underpinning of

this job depreciated the value of the building by $50,000; and that the faulty underpinning left a 7-inch drop in the basement garage ceiling, a permanent sagging and slanting condition.

Defendant Prahl's case came from himself and his employees, above mentioned, and, upon conclusion, he stated that he "rests on the claim that has been filed against him; and refiles and adopts the testimony (of plaintiff) in support of his third party claim."

Fairell's case was the testimony of Mr. Campbell and certain exhibits.

Instruction No. 3 directed the jury to find for plaintiff if it believed:

"First, the plans and specifications provide for pier holes to be drilled to refusal and for specified piers to be belled, and

"Second, that by drilling to refusal is meant drilling to a sufficient weight bearing material to support the apartment building, and

"Third, that any of the holes were not drilled to refusal, or any of the piers specified to be belled were not so belled, and the apartment building was damaged thereby."

Instruction No. 4 directed the jury to find for defendant Prahl if it believed:

"First, that the plans and specifications call for drilling to refusal and that by drilling to refusal is meant that the drill reaches a point where it no longer will penetrate the bottom of the drill hole and that the drill indicates it has reached a point of refusal.

"Second, that defendant through its subcontractors did drill to refusal.

"Third, that the plans and specifications call for the belling of certain piers.

"Fourth, that defendant through its subcontractors did bell the said piers mentioned in evidence according to the plans and specifications."

As between third-party plaintiff and third-party defendant, Instruction No. 6 directed that "If you find in favor of plaintiff against defendant your verdict must be for defendant William J. Prahl as third party plaintiff against third party defendant Wabash Drilling Company (Known as Fairell, Inc.) for the same amount if you believe Wabash Drilling Company failed to drill to refusal or belled (sic) as set forth in the plans and specifications."

Instruction No. 7 directed a verdict for third-party defendant, Fairell, Inc., if the jury found for defendant, and Instruction No. 8 directed a verdict for third-party defendant Fairell, Inc., if the jury found that Fairell (Wabash) did drill to refusal and did bell piers which called for belling in the plans and specifications.

Instruction No. 5 authorized damages to plaintiff in the event of a finding for plaintiff "in such an amount as will compensate plaintiff for the difference, if any, as of November, 1958, between the fair market value of the apartment building as constructed and the fair market value of said building had it been constructed in accordance with the plans and specifications therefor."

The jury returned a unanimous verdict in the form of Instruction No. 10 giving form of verdict and Instruction No. 5, as follows: "We, the jury, find the issues in favor of the plaintiff Ernestine Kahn and award plaintiff Ernestine Kahn damages in such an amount as will compensate plaintiff for the difference, if any, as of November, 1958 between the fair market value of the apartment building as constructed and the fair market value of said building had it been constructed in accordance with the plans and specifications therefor."

Apparently the jury was returned to the jury room inasmuch as the transcript shows, "And thereafter, the jury returned a second verdict, as follows: * * * 'We, the jury, find the issues in favor of the plaintiff Ernestine Kahn and assess plain-

tiff Ernestine Kahn's damages at $50,000.-00.'" This verdict was in the form prescribed by Instruction 10 and was also unanimous.

Defendant Prahl moved for mistrial and discharge of the jury, sustained by the court per memorandum: "Jury having twice returned into Court Verdict Forms contrary to the Instruction of the Court and the Forms of Verdict set out in Instruction No. 10, Motion * * * for discharge of jury and declaration of mistrial sustained. Cause reassigned to Assignment Division for further proceedings."

Plaintiff subsequently moved to set aside the declaration of mistrial, to reinstate the verdict and enter judgment thereon, and to direct a verdict for third-party plaintiff against third-party defendant and enter judgment thereon.

The court sustained this motion by the following Order and Judgment:

"Plaintiff's motion to set aside declaration of mistrial, reinstate jury verdict and enter judgment thereon, and direct verdict in favor of 3rd party plaintiff against 3rd party defendant and enter judgment thereon, heretofore argued and submitted, is hereby SUSTAINED.

"It is ORDERED that the declaration of mistrial and the reassignment of this cause entered on November 6, 1965, be and the same are hereby SET ASIDE.

"It is ORDERED that the verdict of the jury returned on November 6, 1965, in the following form be and the same is hereby RECEIVED and FILED:

" 'We, the jury, find the issues in favor of the Plaintiff Ernestine Kahn and assess plaintiff Ernestine Kahn's damages at $50,000.00.

" '(Signed) Allen W. Perkins

Jury Foreman.'

"WHEREFORE, it is ADJUDGED by the Court that plaintiff Ernestine Kahn

HAVE and RECOVER from defendant William J. Prahl, d/b/a J. A. Prahl Contracting and Building Company, the sum of $50,000.00

"WHEREFORE, because the issues between plaintiff and defendant Prahl and 3rd party plaintiff and 3rd party defendant Fairell, Inc., are identical, and since the verdict of the jury on plaintiff's cause of action is controlling and necessarily requires a like determination of the issues between 3rd party plaintiff and 3rd party defendant, it is further ADJUDGED by the Court that 3rd party plaintiff William J. Prahl, d/b/a J. A. Prahl Contracting and Building Company, HAVE and RECOVER from 3rd party defendant Fairell, Inc., (Formerly Wabash Drilling Co.) the sum of $50,000.00. It is further ADJUDGED by the Court that the cost of these proceedings be and the same are ASSESSED against 3rd party defendant, Fairell, Inc.

"It is ORDERED that the foregoing judgments be entered, nunc pro tunc, as of November 6, 1965.

"Dated this 17th day of December, 1965."

Thereafter the court sustained motions for new trial of both defendant Prahl and third-party defendant Fairell, Inc., and awarded them new trials on certain specific grounds contained in their motions.

One ground specified for awarding a new trial to defendant Prahl on plaintiff's case was: "5. The evidence shows that defendant contracted with third party defendant to perform the drilling and installation of piers according to the plans and specifications and third party defendant contracted to perform said work for plaintiff and defendant and third party defendant is directly responsible to plaintiff and third party plaintiff for any damages resulting from failure to perform its contract."

 Perhaps it may be said that Wabash did, in effect, contract to perform the drilling and belling operations *for* plaintiff's building; nevertheless, the evidence does not show any contract *between* Wa-

bash and plaintiff, Wabash was not a party to the general contract between plaintiff and Prahl, and plaintiff was not a party to the subcontract between Prahl and Wabash. Under such circumstances, third-party defendant Fairell (formerly Wabash) was not "directly responsible to plaintiff," for any breach by Prahl of his general contract with plaintiff or for any breach of its own subcontract with Prahl, because one not a party to a contract is not bound thereby and is not liable for breach of a contract to which he is not a party. Mueninghaus v. James, 324 Mo. 767, 24 S.W.2d 1017, 1020 [4]; Zweifel v. Lee-Schermen Realty Co., Mo.App., 173 S.W.2d 690, 700 [4, 5]; 17A C.J.S. Contracts p. 998, § 520. This being the case, plaintiff, even though she "accepted" the third-party defendant for purposes of trying all the issues before one jury in one lawsuit, could not and did not state any cause of action against Wabash for breach of either of the contracts as would be necessary for her to do in order to recover directly against Wabash and for Wabash to be directly responsible to her. State ex rel. McClure v. Dinwiddie, 358 Mo. 15, 213 S.W.2d 127, 130 [4, 5]; State ex rel. Merino v. Rose, Mo., 240 S.W.2d 705, 707 [1]; Crouch v. Tourtelot, Mo., 350 S.W.2d 799, 803 [6].

The second ground for awarding a new trial to Prahl on plaintiff's claim was that the verdict, which was ordered reinstated and upon which the judgments were entered on December 17, 1965, did not follow the instructions. One of the grounds for awarding a new trial to third-party defendant was "that the act and judgment of the Court and the order so made was one of substance or judicial error and was not one of clerical form or of a clerical nature." Another was "that the jury did not find any verdict against * * * Fairell, Inc., and it was error for this Court to usurp the function of the jury and enter a verdict against this Third Party Defendant." Fairell also contends that the court should have sent the jury back to continue its deliberations until it reached a proper ver-

dict, this being yet another of the grounds for awarding Fairell a new trial.

■ Concededly, the second verdict ultimately accepted by the court did not make the finding directed for defendant Prahl as third-party plaintiff against third-party defendant Wabash in the event the issues were first found for plaintiff against Prahl; and courts, of course, cannot change a verdict in a matter of substance nor can they do so in effect by substituting their verdict for that of the jury and entering a judgment not supported by the verdict. Thorne v. Thorne, Mo., 350 S.W.2d 754, 757 [5]; McIlvain v. Kavorinos, Mo., 219 S.W.2d 349, 351 [6, 7]; Lummi Bay Packing Co. v. Kryder, Mo.App., 263 S.W. 543; Johnson v. Hunter, Mo.App., 398 S.W.2d 449, 452 [3, 4]; Newton v. St. Louis & S. F. R. Co., Mo.App., 153 S.W. 495, 497 [3].

■ However, in this case the verdict was complete and sufficient to support the judgments, and entering the judgments did not constitute a substitution of court verdict for jury verdict or a change of substance in the verdict. " * * * courts * * * construe a verdict liberally in an effort to ascertain the jury's intent. * * * And, of course, the court considers a verdict to see if it can find a reasonably clear intent expressed therein, though perhaps inartfully expressed," Thorne v. Thorne, supra, 350 S.W.2d l. c. 757 [3]; and if the jury's intention "is ascertainable, and the verdict includes findings on the issues required, it is a proper verdict and judgment should be entered thereon. Under such circumstances it would be error for the trial court to refuse to accept the verdict." Haley v. Byers Transportation Co., Mo., 394 S.W.2d 412, 415 [4]. The issue between plaintiff and defendant Prahl was whether Prahl breached his contract with plaintiff by failure to cause piers to be "drilled to refusal" and "belled" as required by the plans and specifications; between Prahl and third-party defendant Wabash the issue was whether Wabash breached its contract with Prahl by failure to drill and bell piers

as required by the plans and specifications. Instructions 3 and 4, which are not questioned, submitted whether "drilling to refusal" meant drilling to a sufficient weight-bearing material to support the building (plaintiff's theory), or meant that the drill reaches a point when it no longer will pentrate the bottom of the drill hole and indicates it has reached a point of refusal (Prahl's and Wabash's definition); whether any of the holes were not "drilled to refusal" and any of the piers specified to be "belled" were not belled; and whether the building was damaged if any holes were not drilled to refusal or any such piers were not belled. The jury's verdict was in the exact form suggested by Instruction No. 10 and found these issues for plaintiff and awarded her $50,000 damages, necessarily against Prahl because he was the only party against whom she had or submitted a cause of action. By Instruction No. 6 the issue between Prahl and Wabash was, as stated by the trial court, "identical" to the issue between plaintiff and Prahl. In other words, under the pleadings, evidence, and instructions in this case, Wabash was liable to Prahl if Prahl was found liable to plaintiff. All the work alleged to be the subject of breach was performed by Wabash, and the breach in respect to such work ascribed by plaintiff to Prahl was, in turn, charged by Prahl to Wabash; and, contracted as the work was, Prahl alone was liable to plaintiff for such breach and Wabash was, in turn, liable for the same breach and in in the same resultant amount of damages to Prahl. Thus, the jury's verdict "made the necessary factual determinations," Haley v. Byers, supra, 394 S.W.2d l. c. 417[9], in respect to Prahl's breach of the general contract with plaintiff and with respect to Wabash's breach of its subcontract with Prahl as well. " * * * the net effect of these findings," Haley v. Byers, supra, l. c. 417[9], was that the judgments in favor of plaintiff and against Prahl and in favor of Prahl and against Wabash for $50,000 were properly entered by the trial court as a matter of law upon reconsideration of the verdict and should not thereafter have been set aside. Even though the jury did not make the finding for Prahl against Wabash, peremptorily directed of it by Instruction No. 6, nevertheless it did make all the findings necessary to a complete verdict upon which to enter the judgments; and even though the court could have directed the jury to retire and correct or complete its verdict, Haley v. Byers, supra, l. c. 415[2], error, if any, in failure so to do was cured by the trial court when it did receive such verdict and entered proper judgments when the plaintiff, by motion, brought the matter to the court's attention. In so doing, the court did not usurp any function of the jury because there was no further function, other than a ministerial one, for the jury to perform.

The facts in Haley v. Byers, supra, lend further support to the foregoing demonstration. Haley sued Byers and its driver, Deem, for personal injuries after having settled with a joint tort-feasor, Southwest Freight Lines, for $80,000; Deem filed a counterclaim. A measure-of-damages instruction told the jury that if it found for plaintiff, it should deduct the $80,000 from the award and, in its last sentence, the instruction also directed the jury that if it found plaintiff's damages at less than $80,-000, then the verdict should be for defendants. The jury first returned a verdict in favor of plaintiff against both defendants, assessing damages at "zero dollars," and further finding for plaintiff on Deem's counterclaim. The court ordered the jury to reconsider and a second verdict was returned for plaintiff against both defendants assessing $20,000 damages, and further finding for plaintiff on the counterclaim. Judgment was entered on the second verdict but, on appeal, the defendants successfully asserted that the first verdict was complete and valid for defendants and should have been received and filed and judgment entered accordingly. In addition to those matters previously quoted, the supreme court said: "It is true that the jury did not do as instructed in the last sentence and, having found that the amount already

paid either equalled or exceeded the amount of plaintiff's damages, did not convert that to a verdict for the defendants. That is not sufficient to make the verdict bad." 394 S.W.2d 1. c. 417[9].

State ex rel. Witte Hardware Co. v. McElhinney, Mo.App., 100 S.W.2d 36, presented a similar situation in that the jury not only failed, but refused, to find in favor of plaintiff on a promissory note as. peremptorily directed. The court declared a mistrial and plaintiff thereafter moved for entry of judgment in its favor in accordance with the court's peremptory instruction. The motion was denied but, on plaintiff's application, a writ of mandamus issued to compel entry of the judgment. The court's reasoning is applicable here: "When the judge sustains (a) request for a peremptory instruction * * *, he does not weigh the evidence, but instead rules solely as a matter of law that no other verdict is legitimately permissible under the evidence except the verdict he directs. * *

"But while the judge acts within his accepted province in directing a verdict, the jury in such an instance departs from its usual function, since in returning a verdict in response to such a direction the jury does not exercise any measure of discretion, but acts only formally, perfunctorily, and ministerially as the instrument by which the court prepares the orderly record which will support the only judgment that can lawfully be rendered in the case." 100 S.W. 2d 1. c. 38[3–6].

 Here, Instruction No. 6 peremptorily directed the jury to return a verdict for third-party plaintiff Prahl against third-party defendant Wabash if the jury first resolved the same issues as between them for plaintiff and against defendant Prahl; and, when the jury made the finding for plaintiff against Prahl, it, of necessity, made the finding prerequisite to the ministerial duty of a subsequent finding for Prahl against Wabash directed by Instruction No. 6. Under such circumstances the court had the duty to enter the judgment necessary to the protection of the valuable right found for plaintiff by the jury and to disposition and conclusion of the whole case. State v. McElhinney, supra, 100 S.W.2d 1. c. 39[10, 11]. Stated yet another way, " * * * a peremptory direction to a jury to make a certain finding, which the jury fails or refuses to do, is, under more modern rulings, in effect, the same as if the finding had been made as directed," Newdiger v. Kansas City, 342 Mo. 252, 114 S.W.2d 1047, 1051; and if the jury fails or refuses to follow the court's instructions and return a verdict as directed by the court, the court may discharge the jury and cause judgment to be entered as directed without the formality of the directed verdict. Insurance, Inc. v. Sanders, Mo.App., 378 S.W.2d 249, 254. See also Burrel Collins Brokerage Co. v. Hines, 206 Mo.App., 669, 230 S.W. 371, 373[3]; Gier v. Clark, Mo., 300 S.W.2d 519, 521[5].

Fairell contends: "It was error for the Court to set aside its order of November 6, 1965, on December 17, 1965, because when the order of December 17, 1965, was made the thirty days from the entry of the original or attempted judgment had elapsed." This corresponds to one of the grounds upon which the court awarded Fairell a new trial, i. e., "that the Court * * * lost jurisdiction of the cause and the power to make said order after declaring a mistrial and after the jury was discharged and after sending the cause back to the Assignment Division * * *."

 The period during which the trial court has control over its judgments is limited to thirty days after entry of judgment, Civil Rule 75.01, V.A.M.R., Romig v. Romig, Mo.App., 360 S.W.2d 737, 738 [1]. Fairell's difficulty in respect to the application of this rule is that the court simply declared a mistrial on November 6, and there was no final judgment or determination then entered to start such 30-day limitation period to run, "because, upon a mistrial * * *, a retrial would automatically follow except and unless the

trial court entered judgment for one of the parties. That retrial, however, is not a new trial in the sense that the former trial had proceeded to a final judgment which the trial court had set aside." Gier v. Clark, supra, 300 S.W.2d 1. c. 521 [5]. See also State v. McElhinney, supra. By Civil Rule 74.01, V.A.M.R., "judgment is the final determination of the rights of the parties in .the action," and "to be 'final' * * * and therefore appealable must of course dispose of all issues." Glick v. Glick, Mo., 372 S.W.2d 912, 915[2]. See also Goldstein v. Floridian Homes, Inc., Mo.App., 331 S.W.2d 124, 126[2, 3]; Scheid v. Pinkham, Mo., 395 S.W.2d 166, 168[2].

This is similar to the pre-1945 Code of Civil Procedure situation in Leavenworth Terminal Railway & Bridge Co. v. Atchison, 137 Mo. 218, 37 S.W. 913, 915[4], where "The court, at its August term, upon first hearing defendant's motion, made an order setting aside the report of the commissioners, and for an assessment of damages by a jury. At the next term this order was set aside, the report was reinstated, and defendant's motion was then overruled, and the report approved and confirmed. Defendant insists that the order first made was in the nature of a final judgment, and could only be set aside at the term at which it was made. We do not agree that the action of the court in setting aside the report of the commissioners was a judgment. It was no finai determination of the rights of the parties. It was a mere order or direction of the court, which remained under its control, subject to be recalled or set aside at any time before the proceedings were finally disposed of."

■ Consequently, under these authorities, the trial court made no final determination and entered no final judgment determinative of its jurisdiction until the entry of judgment on December 17, 1965, from which it subsequently awarded the new trials resulting in these appeals.

Fairell, Inc., also contends that the court erred in not giving it a directed verdict on the third-party claim because:

"(a) Fairell, Inc., had completed the contract satisfactorily according to the admissions and testimony of Prahl.

"(b) Third party plaintiff could not adopt the testimony offered by plaintiff, Kahn, because it was in conflict and at war with third party plaintiff's own testimony."

■ In respect to (b), no objection was made at trial to admission of evidence by way of the recital that Prahl "refiles and adopts" the testimony of plaintiff's case against Prahl in support of Prahl's third-party claim against Wabash; the point is simply a charge of error in the admission of evidence; and, in addition to lack of an objection, there was no such assignment of error in Fairell's motion for new trial. It is, therefore, not for review. Dudeck v. Ellis, Mo., 399 S.W.2d 80, 97[18]; 2A Mo.Dig., Appeal and Error, ☞301. This also is true of Fairell's claims of error in giving Instruction No. 10 on form of verdicts inasmuch as no such assignment was presented in the motion for new trial.

■ In respect to (a) above and as previously stated, the sole issue as to compliance by Wabash with its contract with Prahl was whether pier holes for plaintiff's apartment building were drilled to refusal and whether piers were belled where specified. Failure, if any, of the holes to be drilled to refusal or of piers to be belled would emanate from Wabash because it was the only party to do any such work. Obviously, the jury found that holes had not been drilled to refusal or that piers had not been belled as specified, and the review of the evidence shows that there was ample evidence other than, as well as contrary to, the testimony of Prahl and his employees upon which the jury could decide that fact question. The simple truth is that the jury did not believe Prahl's evidence and defense of himself (and Wabash) that the holes were drilled to refusal or that the

piers were belled as specified and accepted as such and, as previously demonstrated, a finding adverse to Prahl on that issue necessarily required that failure to be directed against Wabash in favor of Prahl.

Finally, Fairell charged that the instruction on the measure of damages "was erroneous in that there was other damage to the building not attributable to any conduct on the part of Fairell, Inc., and * * * because the entire project was $705,000.00 and the cost of repairs were (sic) approximately $8,000.00, and this cost of repairs was insignificant to the total costs of the building and the instruction did not provide for any deduction for damages not attributable to the conduct of the third party defendant."

Fairell cites Kirst v. Clarkson Construction Co., Mo.App., 395 S.W.2d 487, 492[9]: "The measure of damages in cases of this character is stated plainly in Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 686, 253 S.W.2d 158, 164[12]: 'The general rule is that the measure of damages to real estate is the difference in the value of the land before and after the injury by trespass or negligence. However, where damaged land or a building thereon can be restored to its former condition, at a cost *less* than the diminution in value, the cost of restoration may be recovered.'"

Cited also is Hotchner v. Liebowits, Mo. App., 341 S.W.2d 319, 332[25]: "* * * In Walter v. Huggins, 164 Mo.App. 69, 148 S.W. 148, 150, * * * the court reviewed the cases from this and other jurisdictions and quotes with approval from White v. McLaren, an early Massachusetts case found in 151 Mass. 553, 24 N.E. 911, as follows:

"'In determining such damages, different elements are proper for consideration in different cases, according to the nature of the defect. Sometimes the measure of damages is the necessary cost of making the work according to the specifications. * * * The question ordinarily is: How much less is the building fairly worth than

it would have been if the contract had been performed?'

"The court at * * * 148 S.W. 148, at page 151, summed up its review of the cases by stating an old but still vital legal maxim: 'The cases * * * show that, in the choice of rules for the measurement of damages in building cases, the old saying that circumstances alter cases has peculiar force.' * * * One of the most important of the circumstances referred to is the character of the damage when considered in the light of the total amount involved. If the damage alleged can be characterized as insignificant when viewed in the light of the total project, * * * then it would be obviously faulty to require the testimony to be confined to the difference in value as the building was completed and as it should have been completed under the contract."

The rules of these cases do not support the charge of error in respect to Instruction No. 5 because they, in fact, support the court's action in this case.

Curtis v. Fruin-Colnon Contracting Co., 363 Mo. 676, 253 S.W.2d 158, 164[12], proceeded: "'But it frequently happens that an injury or trespass to real property may be in a certain sense irreparable. The condition of things before the trespass was committed or the injury done cannot be restored at all, or can be restored only at * * * great and disproportionate expense. In either of these cases another measure of damages is properly adopted by the courts, namely, the difference in market value of the property before and after the act complained of.'" Likewise, Hotchner v. Liebowits, supra, 341 S.W.2d l. c. 332[25], proceeded: "On the other hand, consider the case of damage which constitutes a substantial portion of the project cost. In that instance the cost of repair might not adequately compensate for the overall loss for in such projects the actual value, if completed as it should have been, might well be more than the sum of its individual parts. In the instant case the damage, both as alleged and proved, was

extensive in character and bore a substantial relationship to the compensation called for under the contract and (builder's) contention that the damage was insignificant is without merit. * * * Instruction No. 7 correctly stated the measure of damages." Instruction No. 7 which "correctly stated the law" is identical in theory and substance to Instruction No. 5 in this case, and the evidence here is sufficient to make a case of substantial, irreparable damage, the situation in which the instruction is appropriate.

As argued by Fairell, Mr. David did testify that part of his company's work, installation of supplemental steel shoring, was to remedy a defect inborn in the building by poor design. He was then describing the scope of all the work he did and was testifying with respect to an attempt to eliminate further plaster cracks in interior walls, a condition separate from the piering problem. His testimony also covered his opinion that plaster cracks in exterior work, in the brickwork, and in the poured foundation, were due to unsatisfactory conditions below the footings. He described the work done to counteract the situation and to "stop the building from settling further," and separated it from the condition in the interior walls. Previous review of the evidence contained the testimony of witnesses Brucker and Reitz which also brought the damages sought by Kahn into the realm of compensation for substantial irreparable injury, i. e., a permanent sagging and slanting condition manifested by a 7-inch drop in the basement garage ceiling, incapable of restoration to former or specified condition.

In respect to the charge that the instruction failed to direct a deduction for damages not attributable to the Wabash operation, the answer is that it did not authorize any damages other than those attributable to failure to construct the building in accordance with plans and specifications; by its terms, consideration of any damage from faulty design was precluded. The instruction is not defective for any of the reasons urged.

Accordingly, the order and judgment awarding new trials to defendant William J. Prahl, d/b/a J. A. Prahl Contracting and Building Co., on plaintiff's petition and to third-party defendant Fairell, Inc., on Prahl's third-party plaintiff's petition is reversed; the cause is remanded with directions to re-enter the judgments for plaintiff Ernestine Kahn against defendant Prahl for $50,000 and for third-party plaintiff Prahl against third-party defendant Fairell, Inc., for $50,000, as of November 6, 1965.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.